United States District Court
Western District of Wisconsin

Derek S. Kramer,

                    Plaintiff,

                                              2011 MAY 12 AM 8:22

          v                                   Case No. 10-cv-224

Rick Raemisch, William Pollard,
Michael Donovan, Dennis Mosher,
Peter Huibregtse, and
Wisconsin Department of Wisconsin,

                    Defendants.

## Plaintiff's Response to Defendants' Proposed Findings of Fact And Responsive Proposed Finding of Fact

Now Comes Plaintiff, Derek S. Kramer, pro se, and hereby submit the following Plaintiff Response to Defendants Proposed Finding of Fact in support of their Motion for Summary Judgement, and Plaintiff presents his Responsive Proposed Findings of Fact in opposition to Defendants Motion for Summary Judgement, attached hereto, as follows:

## Response to Proposed Findings of Fact

1. Derek Kramer # 344479 is a Wisconsin Department of Corrections (DOC) inmate, and is currently incarcerated at the Wisconsin Secure Program Facility. (Complaint Docket # 15, p.2, ¶ (1)

1. No Dispute

2. Rick Raemisch is the former DOC Secretary.

2. No Dispute.

3. William Pollard is employed by DOC as Warden at the Green Bay Correctional Institution (GBCI). (Complaint, Docket #15, p. 3, ¶ 16)

3. Dispute   William Pollard is now the Warden at Waupun Correctional Institution as of March 27, 2011. (Affidavit of Derek Kramp, 5-2-11, Plaintiffs Exh. 27, Admissions from William Pollard), 4-8-2011, p. 2, ¶ 5)

4. Dennis Mosher is employed by DOC as a Corrections Program Supervisor.

4. No Dispute.

5. Peter Huibregtse was employed by DOC as Warden at the Wisconsin Secure Program Facility (WSPF).

6. Michael Clements is employed by DOC, Division of Adult Institution (DAI) as a Deputy Warden at Dodge Correctional Institution, and has held this position since March 2006. (Affidavit of Marc W. Clements, 3-24-11, p. 1, ¶ 2)

6. No Dispute.

7. From 2006 through December 2010, in addition to his duties as the Deputy Warden at Columbia Correctional Institution and Dodge Correctional Institution, Mr. Clements also served as Co-Chair of the Religious Practices Advisory Committee (RPAC). (Affidavit of Marc W. Clements, 3-24-11, p. 2, ¶ 7)

7. No Dispute.

8. Tom Gozinske is employed by DOC as a Correctional Complaint Examiner. (Complaint, Docket #15, p. 3, ¶ 20)

8. No Dispute.

9. Michael Mohr is employed by DOC as an Inmate Complaint Examiner at GBCI. (Complaint, Docket #15, p. 3, ¶ 21)

9. No Dispute

10. Ellen Ray is employed by DOC as an Inmate Complaint Examiner at WSPF. (Complaint, Docket #15, p. 3, ¶ 22)

10. No dispute.

11. Gary Boughton is employed by DOC as Warden at Prairie du Chien Correctional Institution, and formally was ~~the~~ the Security Director and Deputy Warden at GBCI.

11. No dispute.

12. Michael Donovan is employed by DOC as a chaplain, and has held said position since September 1999. (Complaint, Docket #15, p.4, ¶24; Affidavit of Michael Donovan, 4·1·11, p.1, ¶2)

12. No dispute.

13. Wisconsin Department of Corrections, Division of Adult Institutions (DAI) is a State of Wisconsin entity, which oversees adult correctional facilities and bureaus. (Affidavit of Marc W. Clements, 3·24·11, p.1, ¶13)

13. No dispute.

14. The GBCI Chapel provides religious services for all of the umbrella religious groups in addition to special religious programming. There are two chaplains at GBCI, and the chaplains also provide crisis intervention services as well as support programming for inmates as needed. Outside volunteers provide a myriad of programming for various religious affiliations.

14. No dispute.

15. Under no circumstances are inmates authorized to lead or conduct a religious service or study group. (Affidavit of Michael Donovan, 4·1·11, p.2, ¶15)

15. DISPUTE. While a chaplain or volunteer may observe the service taking place prisoners do and have lead and conducted rituals, bluts, pipe and drum service, and religious discussions about culture. (Affidavit of Derek S. Kramer, 5·2·11, p.10, ¶¶ 36, 37, 40; Affidavit of Shane Kashney, 3·29·11, p.2, ¶6,7; Affidavit of Christopher K Bennett, 4·1·11, p.1, ¶¶ 4, 5, p.2, ¶12; Affidavit of Theodore J. Hawver, 2·4·11, p.1, ¶3,4, p.2, ¶6, p.3, ¶15; Affidavit of Matthew Schumacher, 2·23·11, p.3, ¶8 - Attached exhibit section 2, ¶4,6,7,10,12; Affidavit of David Crutchfield, 5·2·11, p.2, ¶15)

- 3 -

16. All umbrella religion group services and study groups are led by a DOC chaplain, an approved spiritual leader/clergy, or an approved outside volunteer. (Affidavit of Michael Donovan, 4.1.11, p.2, ¶15)

16. DISPUTE. See Petitioners response ¶ 15. Same applies here

17. If a DOC inmate wants to start a new religious practice or activity that is not offered at the institution where he resides, which involves other inmates, affects his physical appearance or the operation of the institution, the inmate may submit a request for a new religious practice under Wisconsin Administrative Code § 309.61 on a form DOC-2075, "Request for New Religious Practice." (Affidavit of Michael Donovan, 4.1.11, p.2, ¶6)

17. No Dispute

18. The DOC-2075 is also used if an inmate wants to request a new religious property item, that is not included on the approved Religious Property Chart, which is an addendum to the DAI Policy related to approved religious property. (Affidavit of Michael Donovan, 4.1.11, p.2, ¶7)

18. No Dispute.

19. In his capacity as Chaplain, Chaplain Donovan is responsible for receiving forms DOC-2075 submitted by inmates residing GBCI and making recommendations to the GBCI program Supervisor/Director. (Affidavit of Michael Donovan, 4.1.11, p.2, ¶8)

19. No Dispute.

20. The RPAC member writes comments on the DOC-2075, which form is then forwarded to the Warden, who is responsible for reviewing all recommendations and supporting documentation, if any, and making a final decision on the requested new religious practice or request for new religious property item. (Affidavit of Michael Donovan, 4.1.11, p.3, ¶10)

20. No Dispute

20. The GBCI Program Supervisor/Director is responsible for reviewing DOC-2075 Requests, reviewing my recommendations, obtain any other input deemed necessary and submitting recommendation to RPAC for comment and consideration. (Affidavit of Michael Donovan, 4.1.11, pp.2-3, ¶9)

20. No Dispute

22. Derek Kramer # 314479 submitted three DOC-2075s, all of which he signed on May, 20, 2008. (Affidavit of Michael Donovan, 4-1-11, p.3, ¶11, Exhibit 100)

22. No Dispute

23. In May 2008, the policy in effect and implemented by the DOC division of Adult Institutions related to religious property was 309 IMP 6a. This policy was effective March 1, 2006, and has since been renumbered and replaced with the most current religious property policy known as DAI Policy #309.61.02, effective July 20, 2010. (Affidavit of Michael Donovan, 4-1-11, p.3, ¶12, Exhibit 101)

23. No Dispute

24. On or about May 28, 2008, Chaplain Donovan reviewed a DOC 2075 submitted by Kramer wherein he requested new religious property items, including a set of runes, a Hlath, which is worn on the head during rituals, study books, which help explain the runes, and rune cards, which are used to study/practice divination of the runes, and recommended to deny the DOC-2075 signed by Kramer, wherein he requested the new religious property items. (Affidavit of Michael Donovan, 4-1-11, p.3, ¶13, Exhibit 103, p.2)

24. No Dispute

25. On June 2, 2008, the GBCI Program Director/Supervisor Dennis Misner wrote his comments on the DOC-2075, wherein Kramer requested the new religious property items. (Affidavit of Michael Donovan, 4-1-11, p.3, ¶14, Exhibit 103, p.2)

25. No Dispute.

26. On July 2, 2008, a member of RPAC recommended to deny the DOC-2075, wherein Kramer requested the new religious property items. (Affidavit of Michael Donovan, 4-1-11, p.4, ¶15, Exhibit 103, p.2)

26. No Dispute.

27. On September 21, 2008, the GBCI Warden denied Mr. Kramer's request for the new religious property items as stated on the form Doc-2075. (Affidavit of Michael Donovan, 4-1-11, p.4, ¶16, Exhibit 103, p.2)

27. No Dispute.

28. On or about May 28, 2008, Chaplain Donovan reviewed a Doc-2075 submitted by Kramer wherein he requested a new Religious Practice/Activity. Kramer requested an Asatru Runic and Ritual Blot Group, and on May 28, 2008, Chaplain Donovan recommended to deny this request (Affidavit of Michael Donovan, 4·1·11, p.4, ¶17, Exhibit 103, p.6)

28. No Dispute.

29. On May 30, 2008, the GBCI Program Director/Supervisor Dennis Mosher wrote his comments on the Doc-2075, wherein Kramer requested a new Religious Practice/Activity. (Affidavit of Michael Donovan, 4·1·11, p.4, ¶18, Exhibit 103, p.6)

29. No Dispute.

30. On July 2, 2008, a member of RPAC recommended to deny the Doc-2075, wherein Kramer requested a new Religious Practice/Activity. (Affidavit of Michael Donovan, 4·1·11, p.4, ¶19, Exhibit 103, p.6)

30. No Dispute.

31. On September 21, 2008, the GBCI Warden denied Mr. Kramer's requests for a new Religious Practice/Activity as stated on the Doc-2075. (Affidavit of Michael Donovan, 4·1·11, p.4, ¶20, Exhibit 103, p.6)

31. ~~Dispute~~ No Dispute.

32. On or about May 28, 2008, Chaplain Donovan reviewed a Doc-2075 submitted by Kramer wherein he requested new religious property items, including a Galdor Book, and I recommended changing the Doc 309 IMP 6a to reference "Personal Journal or Workbook," instead of the "Book of Shadows." (Affidavit of Michael Donovan, 4·1·11, p.4, ¶21, Exhibit 103, pp. 10-11)

32. No Dispute.

33. On June 9, 2008, the GBCI Program Director/Supervisor Dennis Mosher wrote his comments on the Doc-2075, wherein Kramer requested a new religious property item. (Affidavit of Michael Donovan, 4·1·11, p.4, ¶22, Exhibit 103, p.11)

33. No Dispute

34. On July 2, 2008, a member of RPAC recommended to deny the Doc-2075, wherein Kramer requested a new religious property item. (Affidavit of Michael Donovan, 4-1-11, p. 4, ¶ 23, Exhibit 103, p. 11)

34. No Dispute.

35. On September 2, 2008, the GBCI Warden denied Kramer's request for a new religious property item as stated on the Doc-2075. (Affidavit of Michael Donovan, 4-1-11, p. 4, ¶ 24, Exhibit 103, p. 11)

35. No Dispute.

36. Chaplain Donovan's only involvement related to Kramer's submission of the Doc-2075's that he signed on May 20, 2008 was to make a recommendation on his requests related to new religious property items and new religious practice/activity. (Affidavit of Michael Donovan, 4-1-11, p. 5, ¶ 25)

36. No Dispute.

37. Chaplain Donovan does not have the authority to make final decisions to approve or deny an inmate's request for new religious property items, for a new religious umbrella group, for a new religious practice or activity, or for a new religious diet request. (Affidavit of Michael Donovan, 4-1-11, p. 5, ¶ 26)

37. DISPUTE. Chaplain Donovan can re-arrange/arrange for "religious services" and/or "the development and presentation of religious instruction classes, programs, and discussion groups" and this management can lead to a "new religious practice." (Affidavit of Michael Donovan, 4-1-11, pp. 1, 2, ¶ 3)

38. All religious items maintained in the GBCI Chapel, such as books, magazines, videos, ect., must be donated regardless of the religious content/preference because the DOC is prohibited from using state funds to order and purchase any religious items for any correctional institution. (Affidavit of Michael Donovan, 4-1-11, p. 5, ¶ 27)

38. No Dispute

39. The only publication that is currently maintained in the GBCI Chapel related to Odinism/Asatru is a "Manual" written by one of the approved DOC

PAGAN VOLUNTEERS. INMATES MAY ALSO DONATE RELIGIOUS PROPERTY ITEMS, BUT IT MUST BE DONE THROUGH THE PROPERTY OFFICE. (AFFIDAVIT OF MICHAEL DONOVAN, 4.1.11, p.5, ¶27)

39. NO DISPUTE.

40. CHAPLAIN DONOVAN HAS ATTEMPTED TO OBTAIN RELIGIOUS MATERIALS RELATED TO ODINISM/ASATRU BY WRITING TO VARIOUS ORGANIZATIONS INQUIRING ABOUT THE DONATION OF MATERIALS, BUT HE HAS NOT RECEIVED ANY RESPONSES FROM ANY OF THE ORGANIZATIONS THAT HE WROTE OR emailed. (AFFIDAVIT OF MICHAEL DONOVAN, 4.1.11, p.5, ¶28)

40. DISPUTE. CHAPLAIN DONOVAN LIST NONE OF THE ALLEGED ORGANIZATIONS HE WROTE OR emailed OR EVEN APPROXIMATELY WHEN HE ALLEGEDLY WROTE OR emailed THESE ORGANIZATIONS. (AFFIDAVIT OF MICHAEL DONOVAN, 4.1.11, p.5, ¶25)

41. ALTHOUGH CHAPLAIN DONOVAN DOES NOT RECALL THE SPECIFIC ORGANIZATIONS THAT CONTACTED OVER THE PAST YEAR OR SO, HE DOES KNOW THAT NONE OF THEM HAVE RESPONDED TO HIS INQUIRIES FOR DONATIONS. (AFFIDAVIT OF MICHAEL DONOVAN, 4.1.11, p.5, ¶28)

41. DISPUTE. SEE PLAINTIFF'S RESPONSE ¶40. FURTHERMORE THIS SELF SERVING STATEMENT DOES NOT EVEN ARTICULATE WHAT DEFENDANT DONOVAN WANTS DONATED. (AFFIDAVIT OF MICHAEL DONOVAN, 4.1.11, p.5, ¶25)

42. AT ALL TIMES, CHAPLAIN DONOVAN HAS ENCOURAGED THE PAGAN UMBRELLA GROUP VOLUNTEER TO INCLUDE SOME TEACHINGS OR RITUALS THAT ARE ODINIST/ASATRU SPECIFIC IN THE RELIGIOUS SERVICES HELD AT GBCI. AFFIDAVIT OF MICHAEL DONOVAN, 4.1.11, p.5, ¶29)

42. DISPUTE. AT NO POINT IN HIS AFFIDAVIT DOES JAMES RIGGS, THE PAGAN UMBRELLA GROUP VOLUNTEER, MENTION BEING ENCOURAGED TO DO ANYTHING CONCERNING ODINISM/ASATRU AND WHILE HE'S BEEN THE GBCI "APPROVED VOLUNTEER" OF "THE PAGAN UMBRELLA GROUP" "SINCE THE FALL OF 2006" MR. RIGGS CAN POINT TO ANYTHING HE BELIEVES TO BE ASATRU/ODINIST RELATED UNTIL "BEGINNING IN FEBRUARY OF 2010". SO EITHER MR. RIGGS IS NOT BEING "ENCOURAGED" OR HE'S NOT BEEN LISTENING TO DEFENDANT DONOVAN UNTIL POSSIBLY THE "BEGINNING IN FEBRUARY OF 2010. (AFFIDAVIT OF JAMES RIGGS,

4.5.11, p.1, ¶ 2, pp. 2/3, ¶ 6; Affidavit of James Dank, 10.29.2009, p.1, ¶ 3-5, p.2, ¶ 10, p.3, ¶ 16, p.4, ¶ 17; Affidavit of Richard Winters, 10.30.2009, p.1, ¶ 4-7, p.2, ¶ 18; Affidavit of James L. Thompson, 4.8.2009, p.1, ¶ 3-5, p.2, ¶ 10, p.3, ¶ 15,16; Affidavit of Anthony Caravella, 3.2.2009, pp. ½, ¶ 4,5, p.2, ¶ 6,7, p.3, ¶ 16, p.4, ¶ 20)

43. Chaplain Donovan has also reminded volunteers for the other umbrella religion groups that the umbrella groups were designed to appeal to a wide range of religious beliefs within a given faith group, and that their religious teachings can and should accommodate the specific beliefs and religious interests of the inmates who are attending their services/study groups (Affidavit of Michael Donovan, 4.1.11, p.5, ¶ 29)

43. DISPUTE. See Plaintiff's response in ¶ 42. Furthermore Plaintiff does not believe "other umbrella religion groups" has anything to do with how the Pagan umbrella religion group is managed or maintained by Defendant Donovan except to highlight how he "encourages" the Pagan umbrella group – allegedly – and he "reminded volunteers for the other umbrella religion groups". (Affidavit of Michael Donovan, 4.1.11, p.5, ¶ 29)

44. All inmates, regardless of their religious preference, are permitted to engage in personal devotional practices in their living quarters (cells), and Chaplain Donovan has suggested to Odinist/Asatru inmates how they can practice their religion privately, using items that are already allowed for the Pagan Umbrella Group, and using these items as tools to be used in conducting rituals in their cells. Affidavit of Michael Donovan, 4.1.11, p.6, ¶ 30)

44. DISPUTE. I see no evidence of this statement in the affidavits cited in ¶ 42.

45. Chaplain Donovan has also inquired of the Odinist/Asatru inmates if they are familiar with places to contact to request donated Odinist/Asatru religious materials, and he has consistantly reminded them that they are permitted to order their own books and materials in accordance with the institution's policies and procedures, if they so choose. (Affidavit of Michael Donovan, 4.1.11, p.6, ¶ 31)

45. NO DISPUTE.

46. THE PURPOSE OF THE RPAC IS TO REVIEW INMATE RELIGIOUS ISSUES THAT ARISE WITHIN DOC; CONSULT WITH DOC STAFF AND VOLUNTEERS, MEMBERS OF RELIGIOUS GROUPS IN THE COMMUNITY, AND THE WISCONSIN DEPARTMENT OF JUSTICE ON RELIGIOUS ISSUES; APPLY, REVIEW AND/OR REVISE THE VARIOUS DOC INTERNAL RELIGIOUS POLICIES AND PROCEDURES; AND RESOLVE RELIGIOUS ISSUES OCCURRING IN ADULT CORRECTIONAL INSTITUTIONS IN A WAY THAT PROMOTES CONSISTANCY AND FAIRNESS WITHIN DAI AND AMONGST THE VARIOUS RELIGIOUS FAITHS. (AFFIDAVIT OF MARC W. CLEMENTS, 3.24.11, p.2, ¶18)

46. NO DISPUTE.

47. IT IS THE POLICY OF THE DOC THAT INCARCERATED INMATES HAVE OPPORTUNITIES TO PURSUE LAWFUL RELIGIOUS PRACTICES OF THE RELIGION OF THEIR CHOICE CONSISTANT WITH SECURITY PRACTICES AND PRINCIPLES, REHABILITATIVE GOALS OF INMATES, HEALTH AND SAFETY, ALLOCATION OF LIMITED RESOURCES, AND RESPONSIBILITIES AND NEEDS OF THE CORRECTIONAL INSTITUTION AND FACILITIES. (AFFIDAVIT OF MARC W. CLEMENTS, 3.24.11, p.2 ¶7; AFFIDAVIT OF DANIEL A. WESTFIELD, 3.24.11, p.2, ¶6)

47. NO DISPUTE.

48. THE RELIGIOUS BELIEFS AND PRACTICES INMATES IN DOC CUSTODY ARE FORMALLY ALLOWED TO EXERCISE ARE SET FORTH IN DAI POLICY# 309.61.01. DAI POLICY# 309.61.01 WAS IMPLEMENTED TO ENSURE THAT INCARCERATED OFFENDERS HAVE UNIFORM OPPORTUNITIES TO PURSUE LAWFUL RELIGIOUS PRACTICES OF THE RELIGION OF THEIR CHOICE. (AFFIDAVIT OF MARC W. CLEMENTS, 3.24.11, p.3 ¶10-11, EXHIBIT 100; AFFIDAVIT OF DANIEL A. WESTFIELD, 3.24.11, p.2, ¶7)

48. NO DISPUTE

49. THE DAI POLICY# 309.61.01 EFFECTIVE JULY 24, 2006, WAS A REVISION OF THE INTERNAL MANAGEMENT PROCEDURE NUMBER DOC 309-IMP#6, "SUBJECT: RELIGIOUS BELIEFS AND PRACTICES," WHICH WAS ORIGINALLY DATED APRIL 1, 1981. (AFFIDAVIT OF MARC W. CLEMENTS, 3.24.11, p.3, ¶11; AFFIDAVIT OF DANIEL A. WESTFIELD, 3.24.11, p.3, ¶8)

49. NO DISPUTE.

50. TO REASONABLY MANAGE THE COORDINATION OF RELIGIOUS SERVICES AND STUDY GROUPS, AND TO MAKE AN EFFORT TO ACCOMODATE INMATES' RELIGIOUS NEEDS, INMATES ARE REQUIRED TO DESIGNATE THEIR RELIGIOUS PREFERENCE. DAI POLICY AND PROCEDURES 309.61.01 ESTABLISHES

THE CONCEPT OF "UMBRELLA RELIGIOUS GROUPS", WHICH ARE INCLUSIVE GROUPS DESIGNED TO APPEAL TO A WIDE RANGE OF RELIGIOUS BELIEFS WITHIN A GIVEN FAITH GROUP. (AFFIDAVIT OF MARC W. CLEMENTS, 3.24.11, p. 3, ¶ 12; AFFIDAVIT OF DANIEL A. WESTFIELD, 3.24.11, p. 3, ¶ 9)

50. NO DISPUTE.

51. THE UMBRELLA RELIGION GROUPS ARE THE PROTESTANT, ISLAM, NATIVE AMERICAN, CATHOLIC, JEWISH, EASTERN RELIGIONS, AND PAGAN. (AFFIDAVIT OF MARC W. CLEMENTS, 3.24.11, p. 3, ¶ 12; AFFIDAVIT OF DANIEL A. WESTFIELD, 3.24.11, p. 3, ¶ 9)

51. NO DISPUTE.

52. PURSUANT TO DAI POLICY AND PROCEDURES 309.61.01, IN ORDER TO PARTICIPATE IN THE RELIGIOUS SERVICES OR STUDY GROUPS ASSOCIATED WITH A GIVEN UMBRELLA RELIGION GROUP, AN INMATE MUST COMPLETE A DOC 1090, RELIGIOUS PREFERENCE FORM, DESIGNATING A RELIGION WITHIN THAT GROUP AS THAT INMATE'S RELIGIOUS PREFERENCE. (AFFIDAVIT OF MARC W. CLEMENTS, 3.24.11, p. 3, ¶ 13; AFFIDAVIT OF DANIEL A. WESTFIELD, 3.24.11, p. 3, ¶ 10)

52. NO DISPUTE.

53. UNDER NO CIRCUMSTANCES ARE INMATES AUTHORIZED TO LEAD OR CONDUCT A RELIGIOUS SERVICE OR STUDY GROUP. (AFFIDAVIT OF MARC W. CLEMENTS, 3.24.11, pp. 3-4, ¶ 14; AFFIDAVIT OF DANIEL A. WESTFIELD, 3.24.11, p. 3, ¶ 11)

53. DISPUTE. SEE PLAINTIFF'S RESPONSE IN ¶ 15.

54. ALLOWING INMATES A POSITION OF POWER OR INFLUENCE IS VERY DANGEROUS IN A PRISON SETTING. (AFFIDAVIT OF MARC W. CLEMENTS, 3.24.11, pp. 3-4, ¶ 14; AFFIDAVIT OF DANIEL A. WESTFIELD, 3.24.11, p. 3, ¶ 11)

54. DISPUTE. APPARENTLY THE DANGER IS MINIMAL AS ALLOWING A PRISONER TO LEAD A PRISON BLOT, PIPE AND DRUM SERVICE, RITUAL, MUSLIM SERVICE IS A REGULAR AFFAIR WITHIN THE DOC. SEE PLAINTIFF'S RESPONSE IN ¶ 15.

55. ALLOWING INMATES TO LEAD THOSE GROUPS WOULD GIVE THEM AUTHORITY OVER OTHER INMATES AND WOULD ALLOW THEM TO INFLUENCE OTHER INMATE'S ACTIONS. (AFFIDAVIT OF MARC W. CLEMENTS, 3.24.11, pp. 3-4, ¶ 14; AFFIDAVIT OF DANIEL A. WESTFIELD, 3.24.11, p. 3, ¶ 11)

55. DISPUTE. LEADING THESE GROUPS, WHICH ARE STILL OBSERVED BY A CHAPLAIN/VOLUNTEER, IS ALREADY DONE IN SOME DOC INSTITUTIONS, SO DOC STAFF DO NOT LOSE THEIR AUTHORITY. SEE AFFIDAVIT

OF MATTHEW SCHUMACHER, 2·23·11, p.3, ¶18, p.4, ¶13; AFFIDAVIT OF CHRISTOPHER K. BENNETT, 4·1·11, p.2, ¶(2)

56. THIS COULD LEAD TO COERCION, STRONG-ARMING, etc. TO COMPEL INMATES TO BREAK THE RULES BY OBTAINING, POSSESSING OR CONCEALING CONTRABAND, THREATENING MEMBERS OF THE PUBLIC, ASSULTING STAFF, etc. A CORRELATION TO THAT WOULD BE DOC ALSO NOT ALLOWING ROLE-PLAYING GAME OR BOOKS, WHICH ALLOW INMATES TO SET THEMSELVES UP AS AUTHORITY FIGURES. (AFFIDAVIT OF MARC W. CLEMENTS, 3·24·11, pp. 3-4, ¶14; AFFIDAVIT OF DANIEL WESTFIELD, 3·24·11, p.3, ¶11)

56. DISPUTE. PLAINTIFF IS UNSURE OF HOW TO DETERMINE THE TERM "etc." AND FAILS TO SEE "A CORRELATION" BETWEEN RELIGIOUS SERVICES, OBSERVED BY A CHAPLAIN/STAFF MEMBER/ VOLUNTEER, AND AN UNOBSERVED "ROLE-PLAYING" GAME OR BOOK. PRISONER LEAD SERVICES ARE DONE FROM A PRE-APPROVED SCRIPT AND OBSERVED BY DOC STAFF/VOLUNTEER. ~~FAILED~~ (SEE PLAINTIFF'S RESPONSE TO ¶ 55)

57. EACH UMBRELLA GROUP IS LED BY A RECOGNIZED NON-DOC SPIRITUAL LEADER, OR BY A DOC STAFF MEMBER IF STAFF RESOURCES AND STAFF AVAILABILITY PERMITS, AND IS PROVIDED STAFF TO MONITOR RELIGIOUS SERVICES AND STUDY GROUPS, AN ANNUAL FEAST, (IF APPROPRIATE FOR THE UMBRELLA GROUP), A LIST OF APPROVED RELIGIOUS PROPERTY, AND MANY HAVE SPECIAL RELIGIOUS DIETS AND SEGREGATED ACCOUNTS FOR FUNDS DONATED TO THE GROUP. (AFFIDAVIT OF MARC W. CLEMENTS, 3·24·11, p.4, ¶15; AFFIDAVIT OF DANIEL A. WESTFIELD, 3·24·11, p.4, ¶12)

57. DISPUTED. SEE PLAINTIFFS RESPONSE IN ¶ 15.

58. THE USE OF UMBRELLA GROUPS ALLOWS THE DEPARTMENT TO USE ITS LIMITED RESOURCES AS EFFICIENTLY AS POSSIBLE TO ACCOMMODATE THE RELIGIOUS PRACTICES OF THE GREATEST NUMBER OF INMATES. (AFFIDAVIT OF MARC W. CLEMENTS, 3·24·11, p.4, ¶16, AFFIDAVIT OF DAVID A. WESTFIELD, 3·24·11, p.4, ¶13)

58. DISPUTED. "THE DEPARTMENT HAS A LIMITED AMOUNT OF RESOURCES AND WILL PROVIDE RELIGIOUS SERVICES TO THE LARGEST NUMBERS OF INMATES WITHIN DESIGNATED RELIGIOUS PREFERENCES" IS WHAT THE DAI POLICY# 309.61.01, SECTION II, A.3. STATES BUT AT GBCI THEY DO NOT HONOR THEIR OWN "LARGEST NUMBERS" POLICY. INSTEAD THEY PUT TOGETHER SOME HODGE-PODGE TEACHINGS AND RITUALS THAT DO NOT REFLECT "THE GREATEST NUMBER" WHICH IS

- 12 -

Odinist/Asatru. At Waupun Correctional they've "split" rituals and at WSPF they've had to completely separate Odinist/Asatru (and its sects) from the "Universal Rituals." (Affidavit of Marc W. Clements [for Defendants], 3.24.11, Exhibit 100; Affidavit of Michael Donovan, 4.1.11, p. 5, ¶ 29 "include some teachings or rituals..."; Affidavit of James Riggs, 4.5.11, p. 2, ¶ 6 "lessons are designed to include all groups... Odinist continue to complain..."; Affidavit of James Dank, 10.29.09, p. 3, ¶ 12; Affidavit of Matthew Schumacher, 2.23.11, p. 3, ¶ 9; Affidavit of Christopher K. Bennett, 4.1.11, p. 1, ¶ 11) (Affidavit of Derek S. Kramer, 5.2.11, Exhibit 1, p. 2, Exh. 4)

59. Without the use of umbrella groups, inmates would likely have less opportunities to practice their religion because resources such as staff time, institution funds, and space would have to be divided among an ever-increasing number of different religions. (Affidavit of Marc W. Clements, 3.24.11, p. 4, ¶ 17; Affidavit of Daniel A. Westfield, 3.24.11, p. 4, ¶ 14)

59. ~~Contested.~~ Disputed. As this suit is about Odinism and practice at GBCI "less opportunities to practice" is already the status quo. (Affidavit of Derek S. Kramer, 5.2.11, p. 1, ¶ 6, p. 2, ¶ 10, 11, p. 3, ¶ 12, 15, Exhibit 1, p. 2, ¶ 3, Exh. 4, ¶ 4 "rather than teachings and rituals that focus only on one path"; Affidavit of James Dank, 10.29.09, p. 4, ¶ 17, Affidavit of Levi Doherty, 8.11.10, p. 1, ¶ 3, p. 2, ¶ 6, Affidavit of Richard Winters, 10.30.09, p. 2, ¶ 18, 19; Affidavit of James L. Thompson, 4.8.09, p. 3, ¶ 16, Affidavit of Anthony Caravella, 3.2.09, p. 1, ¶ 4)

60. Umbrella groups allow similar religions to share resources, which allows for, among other things, sufficient time for more meaningful religious services and religious feasts. (Affidavit of Marc W. Clements, 3.24.11, p. 4, ¶ 17; Affidavit of Daniel A. Westfield, 3.24.11, p. 4, ¶ 14)

60. ~~Contested.~~ Dispute. See Plaintiff's response in ¶ 59.

61. Without the use of umbrella groups, for every new religious group institutions would be required to use limited resources to find and provide a recognized spiritual leader, provide space to conduct the activity, provide staff to monitor religious services and study groups, accommodate additional annual feasts, accommodate additional dietary restrictions and potentially allow for additional business office staff time to create and manage a segregated account for funds donated to the group. (Affidavit of Marc

W. Clements, 3.24.11, p. 4, ¶ 18, Affidavit of Daniel A. Westfield, 3.24.11, p. 4, ¶ 15)

61. DISPUTE. A recognized spiritual leader is not necessary if GBCI would hav adapted the option other Maximum Security institutions follow or give Odinist the same treatment given Native American Pipe and drum services. Since Odinist (and its sects) would have left the GBCI Pagan Umbrella Group they could've had one day of the Pagan Services Schedule. (See Plaintiff's Response to ¶ 15; Affidavit of Derek S. Kramer, 5.2.11, Exhibit 20)(Affidavit of Laurel M. Owen-Scutari, 12.27.10, p. 6, ¶ 20)

62. Religious umbrella groups are also designed to reduce the risk of gang-related activity by making it harder for prohibited groups to use religious practice as a means of expressing gang affiliations and conducting gang-related activities during religious services or study groups. (Affidavit of Marc W. Clements, 3.24.11, pp. 4-5, ¶ 19; Affidavit of Daniel A. Westfield, 3.24.11, p. 4-5, ¶ 16)

62. No Dispute.

63. Umbrella groups achieve this goal by being inclusive and thereby preventing esoteric gang related religious factions from getting separate accommodations which could pose serious security concerns. (Affidavit of Marc W. Clements, 3.24.11, pp. 4-5, ¶ 19; Affidavit of Daniel A. Westfield, 3.24.11, p. 4-5, ¶ 16)

63. No Dispute.

64. Prison security is threatened when individual inmates are able to differentiate themselves and be seen as leaders of a group. (Affidavit of Marc W. Clements, 3.24.11, p. 5, ¶ 20; Affidavit of Daniel A. Westfield, 3.24.11, p. 5, ¶ 17)

64. DISPUTE. This is pure conjecture. On what basis is Odinism "narrower?" With proper observation, as given in other umbrella groups, Odinist would be given an equal opportunity to practice Odinism and produce results the same as other umbrella groups. (See Plaintiff's Response to ¶ 15)

65. Allowing narrower religions such as Odinism or Asatru gain recognition as a separate umbrella group would make it easier for individual inmates to gain leadership status and recruit followers. (Affidavit of Marc W. Clements, 3.24.11, p. 5, ¶ 20; Affidavit of Daniel A. Westfield, 3.24.11, p. 5, ¶ 17)

-14-

65. DISPUTE.  SEE PLAINTIFF'S RESPONSE TO ¶64.

66. DOC DAI RECOGNIZES THAT RELIGIOUS BELIEFS CAN PROVIDE SUPPORT TO INMATES THAT MAY AID IN THEIR ADJUSTMENT TO INSTITUTIONAL LIFE AND MAY LEAD TO THE DEVELOPEMENT OF COMMUNITY TIES AND VALUES THAT CAN BE HELPFUL IN THE INMATE'S SUCCESSFUL REHABILITATION AND REINTEGRATION TO THE COMMUNITY UPON RELEASE (AFFIDAVIT OF MARC W. CLEMENS, 3·24·11, P. 5, ¶21; AFFIDAVIT OF DANIEL A. WESTFIELD, 3·24·11, p. 5, ¶18)

66. NO DISPUTE.

67. THE DAI REQUIRES THAT ALL DOC CORRECTIONAL INSTITUTIONS STRIVE TO ENSURE THAT INCARCERATED OFFENDERS HAVE OPPORTUNITIES TO PURSUE LAWFUL RELIGIOUS PRACTICES OF THE RELIGION OF THEIR CHOICE, WHICH ARE CONSISTENT WITH SECURITY PRACTICES AND PRINCIPLES, REHABILITIVE GOALS, HEALTH AND SAFETY, ALLOCATION OF LIMITED RESOURCES AND MEETS THE RESPONSIBILITIES AND NEEDS OF THE CORRECTIONAL INSTITUTION. (AFFIDAVIT OF MARC W. CLEMENS, 3·24·11, p. 5, ¶22; AFFIDAVIT OF DANIEL A. WESTFIELD, 3·24·11, p. 5, ¶19)

67. NO DISPUTE

68. INMATES MAY EXERCISE THEIR RELIGIOUS BELIEFS AND PRACTICES IN THE FOLLOWING WAYS: (1) CONGREGATE SERVICES; (2) RELIGIOUS DIET REQUESTS; (3) INDIVIDUAL STUDY; (4) PERSONAL MEDITATION; (5) UTILIZING OF RELIGIOUS BOOKS AND/OR PROPERTY; (6) CELEBRATION OF A RELIGIOUS FEAST; (7) INDIVIDUAL RELIGIOUS OBSERVANCE IN THEIR LIVING QUARTERS; (8) CORRESPONDENCE WITH FELLOW BELIEVERS; (9) PASTORAL VISITS; AND (10) REQUESTING TO ABSTAIN FROM WORK OR PROGRAM ON RELIGIOUS DAYS OF OBSERVANCE. (AFFIDAVIT OF MARC W. CLEMENS, p. 5, ¶23; AFFIDAVIT OF DANIEL A. WESTFIELD, 3·24·11, p. 5, ¶20)

68. DISPUTE. PLAINTIFF WAS STOPPED FROM OBTAINING THE OPPORTUNITY TO: (1) CONGREGATE AT SERVICES; (2) RELIGIOUS DIET REQUEST; (3) INDIVIDUAL STUDY WITH RUNES; (4) PERSONAL MEDITATION ON RUNES WITH A HLATH; (5) UTILIZING OF RELIGIOUS PROPERTY; (6) CELEBRATION OF RELIGIOUS FEAST FOOD; (7) INDIVIDUAL RELIGIOUS OBSERVANCE IN LIVING QUARTERS WITH NECESSARY RELIGIOUS ITEMS. (AFFIDAVIT OF DEREK S. KRAMER, 5·2·11, EXHIBIT 8, EXHIBIT 10, EXHIBIT 13, AND EXHIBIT 14, AS WELL AS p. 4, ¶16, EXHIBIT 4 & 5, ALSO SEE p. 14, ¶60)

69. THE DAI REQUIRES THAT ALL DOC CORRECTIONAL INSTITUTIONS RESPECT THE DIVERSITY OF INMATE RELIGIOUS BELIEFS AND ALSO RESPECTS THE RIGHT TO HOLD NO RELIGIOUS BELIEF. (AFFIDAVIT OF MARC W. CLEMENS, 3·24·11, p. 6, ¶24; AFFIDAVIT OF DANIEL A. WESTFIELD, 3·24·11, p. 6, ¶22)

69. No Dispute.

70. DOC Correctional Institutions Do Not Permit Religious or Non-Religious Activities that Advocate Racial or Ethnic Supremacy or Purity, or that Attack a Racial, Religious or Ethnic Group, Promote Hate Crimes or Jeopardize the Security and Order of the Institution. (Affidavit of Marc W. Clements, 3.24.11, p6, ¶25; Affidavit of Daniel A. Westfield, 3.24.11, p.6, ¶22)

70. No Dispute.

71. Institutions will make every effort to facilitate an inmate's observance of days of special significance. The inmate's request must be consistant with the inmate's designated religious preference. (Affidavit of Marc W. Clements, 3.24.11, p.6, ¶26; Affidavit of Daniel A. Westfield, 3.24.11, p.6, ¶23)

71. Dispute. GBCI does not allow Blots or Sumbel at the chapel and "Blots and Sumbel correspond to Odinist Holy Days." (Affidavit of Derek S. Kramer, 5.2.11, p.10, ¶42, p.11, ¶43; Affidavit of Laurel M. Owen-Schutari, 12.27.10, p.3, ¶11, p.4, ¶16)

72. In order to ensure that DOC inmates have Religious Property Items for them to use in exercising their Religious Beliefs and Practices, the DAI implemented Internal Management Procedure # DOC 309 IMP 6A, "Subject: Religious Property," which was originally effective in May 1996, and was recently re-numbered and is now known as DAI Policy # 309.61.02, "Religious Property." (Affidavit of Marc W. Clements, 3.24.11, p.6, ¶27, Exhibit 101; Affidavit of Daniel A. Westfield, 3.24.11, p.6, ¶24)

72. No Dispute

73. A Religious Property Chart was an Addendum to DOC IMP 6A, and has been revised from time to time. The current DAI Policy #309.61.02 has been attached known as the Religious Property Chart, and the most current revision of the chart related to allowed Religious Property is dated July 2010. (Affidavit of Marc W. Clements, 3.24.11, p.6, ¶27, Exhibit 101; Affidavit of Daniel A. Westfield, 3.24.11, p.6, ¶24)

73. No Dispute

74. DAI Policy # 309.61.02 is used as a guideline for Correctional Institutions to ensure that inmates have access to Religious Items as Personal Property and/or during approved umbrella

Religious group use. (Affidavit of Marc W. Clements, 3·24·11, pp. 6-7, ¶28; Affidavit of Daniel A. Westfield, 3·24·11, p.6, ¶25)

75. The Religious Property Chart attached to DAI Policy # 309.61.02 sets forth the minimum property items that inmates in the umbrella religions recognized by DOC should have access to and possess as religious personal property. (Affidavit of Marc W. Clements, 3·24·11, pp. 6-7, ¶28; Affidavit of Daniel A. Westfield, 3·24·11, p.6, ¶25)

75. No Dispute.

76. The Purpose of DAI Policy # 309.61.02 is to ensure that inmates have opportunities to possess religious property items as personal property. Religious property items that become part of an inmate's personal property are subject to the safety considerations of each correctional institution. (Affidavit of Marc W. Clements, 3·24·11, p.7, ¶29; Affidavit of Daniel A. Westfield, 3·24·11, p.7, ¶26)

76. ~~~~ Dispute. This DAI Policy is also to maintain "consistency across all" DOC institutions. ~~The minimum personal property such across all religious personal property. DOC inmates~~ ~~are not~~ In fact DOC staff — chaplains and program supervisors such as Defendant Donovan and Defendant Mosher (who make institutional recommendations on new religious property requested in DOC-2075s. See ¶¶ 19, 20) — are trained to maintain "consistency across all" DOC institutions when it comes to religious property. (Affidavit of Derek S. Kramer, 5·2·11, Exhibit 40, ¶11, Exhibit 2, p.7, ¶31)

77. An inmate's personal property may also include religious personal property. DOC inmates are permitted to possess approved religious property associated with their designated religious preference, unless the item presents a threat to the order and safety of the institution. (Affidavit of Marc W. Clements, 3·24·11, p.7, ¶30; Affidavit of Daniel A. Westfield, 3·24·11, p.7, ¶27)

77. No Dispute

78. In order to provide all DOC inmates with the least restrictive opportunities to possess religious property items as personal property, the DAI has the authority and duty to consistently review the religious property items that it has deemed allowed and not allowed. (Affidavit of Marc W. Clements, 3·24·11, p.7, ¶31; Affidavit of Daniel A. Westfield, 3·24·11, p.7, ¶28)

78. No Dispute

79. DAI Policy 309.61.02 is a Department-wide procedure applicable to all DOC Adult correctional institutions, although each institution has the authority to apply the procedures consistent with their specific security risks and concerns. (Affidavit of Marc W. Clements, 3.24 p. 7, ¶ 32; Affidavit of Daniel A. Westfield, 3.24.11, p. 7, ¶ 29)

79. No Dispute.

80. Inmates who want to request a new religious practice or activity that is not offered at an institution or a new religious property item that is not on the pre-approved religious property list may complete a "Request for New Religious Practice", Form DOC-2075. (Affidavit of Marc W. Clements, 3.24.11, p. 7, ¶ 33; Affidavit of Daniel A. Westfield, 3.24.11, p. 7, ¶ 30)

80. No Dispute.

81. The submission of a DOC 2075 is an available administrative remedy for inmates seeking any type of religious property or practice not allowed in the religious policies. A 2075 form is the vehicle an inmate uses, and DAI relies upon, to bring any new religious issues before the RPAC for investigation and an informed decision. (Affidavit of Marc W. Clements, 3.24.11, p. 7, ¶ 34; Affidavit of Daniel A. Westfield, 3.24.11, p. 7, ¶ 31)

81. No Dispute.

82. To make a request for a new religious practice, an inmate must submit the request to the chaplain on a form DOC-2075. (Affidavit of Marc W. Clements, 3.24.11, p. 8, ¶ 35; Affidavit of Daniel A. Westfield, 3.24.11, pp. 7-8, ¶ 32)

82. No Dispute.

83. The chaplain will review the request and make a recommendation. The Program Supervisor also will review the request and make a recommendation. The Department of Adult Institution Religious Policy Advisor/Coordinator also will review the request and make a recommendation. Finally, the request goes to the warden for review. The warden makes a final decision based on the recommendations described above. (Affidavit of Marc W. Clements, 3.24.11, p. 8, ¶ 35; Affidavit of Daniel A. Westfield, 3.24.11, p. 7-8, ¶ 32)

83. No Dispute.

84. Religious property includes religious emblems which are generally recognized by the inmate's religion as having religious significance. (Affidavit of Marc W. Clements, 3.24.11, p. 8, ¶ 36; Affidavit of

- 18 -

DANIEL A. WESTFIELD, 3·24·11, p.8, ¶ 33)

84. NO DISPUTE.

85. ALL RELIGIOUS PROPERTY ITEMS MUST BE IN COMPLIANCE WITH RESTRICTIONS ~~OR PROPERTY WHICH AN INSTITUTION CAN EXCLUDE, ARE EXCLUDABLE~~ SET FORTH IN THE RELIGIOUS PROPERTY CHART ATTACHED TO DAI POLICY #309.61.02 (AFFIDAVIT OF MARC W. CLEMENTS, 3·24·11, p.8, ¶ 37; AFFIDAVIT OF DANIEL A. WESTFIELD, 3·24·11, p.8, ¶ 34)

85. NO DISPUTE.

86. ALL DOC CORRECTIONAL INSTITUTIONS ARE REQUIRED TO MONITOR AND CONTROL AUTHORIZED PROPERTY IN AN INMATE'S POSSESSION, INCLUDING RELIGIOUS PROPERTY, (AFFIDAVIT OF MARC W. CLEMENTS, 3·24·11, p.8, ¶ 38; AFFIDAVIT OF DANIEL A. WESTFIELD, 3·24·11, p.8, ¶ 35)

86. NO DISPUTE.

87. IT IS IMPORTANT TO POINT OUT THE CONTEXT WITHIN WHICH THE RPAC WAS FORMED AND THE RELIGIOUS PROCEDURES WERE REVISED. OVER THE PAST APPROXIMATELY 20 YEARS, THE INMATE POPULATION WITHIN DOC HAS QUADRUPLED. THE NUMBER OF STATE CORRECTIONAL INSTITUTIONS HAS INCREASED BY NINE. (AFFIDAVIT OF MARC W. CLEMENTS, 3·24·11, p.8, ¶ 39; AFFIDAVIT OF DANIEL A. WESTFIELD, 3·24·11, p.8, ¶ 36)

87. DISPUTE. "QUADRUPLED" IS A SELF SERVING AND VAGUE STATEMENT SUPPORTED BY NO EVIDENCE. (AFFIDAVIT OF MARC W. CLEMENTS, 3·24·11, p.8, ¶ 39; AFFIDAVIT OF DANIEL A. WESTFIELD, 3·24·11, p.8, ¶ 36)

88. OVER THIS TIME, THERE HAS BEEN NO CORRESPONDING INCREASE IN STAFFING WITHIN INDIVIDUAL CORRECTIONAL INSTITUTIONS EVEN THOUGH INMATE POPULATION WITHIN INDIVIDUAL INSTITUTIONS HAS INCREASED SIGNIFICANTLY AND, IN FACT, AT VARIOUS TIMES IN THE PAST AND AGAIN NOW THE STATE FACES SIGNIFICANT BUDGET DEFICITS THAT HAVE NECESSITATED STAFF REDUCTIONS AND/OR HIRING FREEZES. (AFFIDAVIT OF MARC W. CLEMENTS, 3·24·11, p.8, ¶ 40; AFFIDAVIT OF DANIEL A. WESTFIELD, 3·24·11, p.8, ¶ 37)

88. DISPUTE. CONJECTURE. THIS STATEMENT CITES NO ACTUAL WITNESSING OF REPORTS OR EVIDENCE AND REQUESTS THAT WE BELIEVE A SELF SERVING ~~PARTIAL~~ ANALYSIS. (AFFIDAVIT OF MARC W. CLEMENTS, 3·24·11, p.8, ¶ 40; AFFIDAVIT OF DANIEL A. WESTFIELD, 3·24·11, p.8, ¶ 37)

89. AT THE SAME TIME, THE NATURE AND TYPE OF INMATES IN OUR SYSTEM HAVE BECOME MORE PROBLEMATIC WITH MORE INMATES FACING LENGTHY SENTENCES OR LIFE WITHOUT PAROLE, AN INCREASE IN GANG PROBLEMS, etc. (AFFIDAVIT OF MARC W. CLEMENTS, 3·24·11, p.8, ¶ 41; AFFIDAVIT OF DANIEL A. WESTFIELD, 3·24·11, p.8, ¶ 38.

89. DISPUTE. TERMS "THE NATURE" AND "etc." ARE VAGUE, SELF SERVING, AND ARE SUPPORTED BY NO EVIDENCE, AND LEAD TO MULTIPLE INTERPRETATIONS. "AN INCREASE IN GANG PROBLEMS" IS A VAGUE STATEMENT SUPPORTED BY NO EVIDENCE. (AFFIDAVIT OF MARC W. CLEMENTS, 3.24.11, p.8, ¶ 41; AFFIDAVIT OF DANIEL A. WESTFIELD, 3.24.11, p.8, ¶ 38)

90. ALL OF THE FACTORS DESCRIBED IN THE PRECEDING PARAGRAPHS HAVE RESULTED IN PLACING UNPRECEDENTED PRESSURES AND STRESSES ON STATE CORRECTIONAL INSTITUTIONS AND STAFF FROM A SECURITY, ADMINISTRATIVE, AND FINANCIAL STANDPOINT, AND HAVE AFFECTED CORRECTIONS OPERATIONS IN VIRTUALLY ALL AREAS (AFFIDAVIT OF MARC W. CLEMENTS, 3.24.11, p.9, ¶ 42; AFFIDAVIT OF DANIEL A. WESTFIELD, 3.24.11, p.9, ¶ 39)

90. DISPUTE. TERM "VIRTUALLY ALL AREAS" IS VAGUE, SELF SERVING, SUPPORTED BY NO EVIDENCE, AND REST ON FACTORS DESCRIBED IN PRECEDING PARAGRAPHS THAT ARE ALSO VAGUE, SELF SERVING, AND SUPPORTED BY NO EVIDENCE (eg. "etc.", "THE NATURE", "QUADRUPLED" IN ¶ 87, 88, 89), AND FORCES US TO IMAGINE WHAT AN "UNPRECEDENTED PRESSURES AND STRESSES" MIGHT OR MIGHT NOT MEAN. (AFFIDAVIT OF MARC W. CLEMENTS, 3.24.11, p.9, ¶ 42; AFFIDAVIT OF DANIEL A. WESTFIELD, 3.24.11, p.9, ¶ 39)

91. THEREFORE, IT WAS THE GOAL OF THE RPAC IN REVISING THE PROCEDURES RELATED TO RELIGIOUS BELIEFS, PRACTICES AND PROPERTY TO HELP MINIMIZE AND ALLEVIATE THESE PRESSURES AND STRESSES. (AFFIDAVIT OF MARC W. CLEMENTS, 3.24.11, p.9, ¶ 43; AFFIDAVIT OF DANIEL A. WESTFIELD, 3.24.11, p.9, ¶ 40)

91. DISPUTE. THE TERM "THESE PRESSURES AND STRESSES" IS VAGUE. SEE RESPONSE IN ¶ 90. (AFFIDAVIT OF MARC W. CLEMENTS, 3.24.11, p.9, ¶ 43; AFFIDAVIT OF DANIEL A. WESTFIELD, 3.24.11, p.9, ¶ 40)

92. ADDITIONALLY, IT WAS ALSO A GOAL OF THE RPAC TO IMPROVE CONSISTANCY REGARDING RELIGIOUS BELIEFS, PRACTICES AND PROPERTY BETWEEN THE INSTITUTIONS. (AFFIDAVIT OF MARC W. CLEMENTS, 3.24.11, p.9, ¶ 43; AFFIDAVIT OF DANIEL A. WESTFIELD, 3.24.11, p.9, ¶ 40)

92. NO DISPUTE.

93. FOREMOST, AS WITH ANY CORRECTIONAL INSTITUTION, AVAILABLE SPACE REQUIRES THAT LIMITS BE SET ON THE QUANTITY OF ALLOWABLE PROPERTY. THE POPULATION GROWTH IN THE INMATE POPULATION OVER THE LAST 10 YEARS HAS CREATED AN OVERCROWDING PROBLEM IN DOC INSTITUTIONS. (AFFIDAVIT OF MARC W. CLEMENTS, 3.24.11, p.9, ¶ 44; AFFIDAVIT OF DANIEL A. WESTFIELD, 3.24.11, p.9, ¶ 41)

93. DISPUTE. "IN DOC INSTITUTIONS" IS VAGUE AND NON-SPECIFIC TO GBCI AND WSPF. (AFFIDAVIT OF MARC W. CLEMENTS, 3.24.11, p.9, ¶ 44; AFFIDAVIT OF DANIEL A. WESTFIELD, 3.24.11, p.9, ¶ 41)

94. The overcrowding requires doubling inmates in cells and the expansion of additional housing areas. Available space simply does not allow inmates to posses endless supplies of religious property. Thus, a clear limit must be placed on religious property so as to allow enough space for double-cell inmates and other allowable property items. (Affidavit of Marc W. Clements, 3-24-11, p. 9, ¶ 45; Affidavit of Daniel A. Westfield, 3-24-11, p. 9, ¶ 42)

94. DISPUTE. The DOC has already responded to the property/religious property issue. As cited in DAI Policy # 309.61.02 all religious property is subject to DAI Policy # 309.20.03 "inmate personal property and clothing", in which religious property is NOT exempt from the DOC set property limits of "page 3, section B.5." (Affidavit of Marc W. Clements, 3-24-11, Exhibit 101, p. 2, section I.B.; Affidavit of Derek S. Kramer, 5-2-11, Exhibit 26, section B.5.)

95. In addition, expanded volumes of inmate property has an adverse effect on the security of the institution. To maintain a safe and secure environment for staff and inmates, searches of inmate living areas are required to ensure contraband is not present. (Affidavit of Marc W. Clements, 3-24-11, p. 9, ¶ 46; Affidavit of Daniel A. Westfield, 3-24-11, p. 9, ¶ 43)

95. DISPUTE. "Expanded volumes of inmate property" has already been responded to. See plaintiff's response in ¶ 94.

96. The increased number of inmates and volumes of religious property substantially reduces the security staff's ability to effectively search living areas and allows for introduction of contraband property to occur. (Affidavit of Marc W. Clements, 3-24-11, p. 9, ¶ 47; Affidavit of Daniel A. Westfield, 3-24-11, p. 9, ¶ 44)

96. DISPUTE. "Volumes of religious property" has already responded to this issue. See plaintiff's response in ¶ 94.

97. There is always health and safety concerns associated with contraband because inmates trade items, misuse items and steal items. Inmates could also use excessive quantities of property to conceal serious contraband such as a weapon, drugs, money, etc. (Affidavit of Marc W. Clements, 3-24-11, p. 10, ¶ 48; Affidavit of Daniel A. Westfield, 3-24-11, p. 10, ¶ 45)

97. DISPUTE. "Excessive quantities of property" has already been addressed by DOC. Also,

A RECORD OF AN ~~ENTERING~~ PRISONER'S PROPERTY IS "ADDED TO THE INMATE'S PROPERTY INVENTORY" AND "A RECORD" OF ANY ADDITIONAL PROPERTY IS HELD BY "THE HOUSING UNIT OFFICER." THIS ADDRESSES ANY ISSUES OF TRADING ITEMS, ~~MISSING~~ MISUSING ITEMS AND STEALING ITEMS. (SEE PLAINTIFF'S RESPONSE IN ¶ 94; SEE DEFENDANTS PROPOSED FINDINGS OF FACT ["PFOF"], PP. 19-20, ¶ 104)

98. THESE CONCERNS ARE ALSO PRESENT WHEN INMATES ARE TRANSFERRED BETWEEN INSTITUTIONS AND/OR CHANGES IN INTERNAL STATUS REQUIRE INMATE PROPERTY TO BE SEARCHED AND INVENTORIED. (AFFIDAVIT OF MARC W. CLEMENS, 3·24·11, P. 10, ¶ 49; AFFIDAVIT OF DANIEL A. WESTFIELD, 3·24·11, P. 10, ¶ 46)

98. DISPUTE. "THESE CONCERNS" HAVE BEEN ADDRESSED BY THE DOC. (AFFIDAVIT OF DEREK S. KRAMER, 5·2·11, EXHIBIT 28)

99. THESE INVENTORIES AND SEARCHES OF INMATE PROPERTY CONSUME A GREAT DEAL OF STAFF RESOURCES TO MAINTAIN, AND POSE SECURITY CHALLENGES IN ENSURING AN ITEM IS NOT BEING MISUSED. (AFFIDAVIT OF MARC W. CLEMENS, 3·24·11, P. 10, ¶ 50; AFFIDAVIT OF DANIEL A. WESTFIELD, 3·24·11, P. 10, ¶ 47)

99. DISPUTE. "A GREAT DEAL" ~~OF RESOURCES~~ IS A STATEMENT THAT IS ~~OVERLY~~ VAGUE, SELF SERVING AND ASKS FOR CONJECTURE ON BEHALF OF ANYONE READING THIS VAGUENESS. (AFFIDAVIT OF MARC W. CLEMENS, 3·24·11, P. 10, ¶ 50; AFFIDAVIT OF DANIEL A. WESTFIELD, 3·24·11, P. 10, ¶ 47)

100. FROM THE COMMITTEE'S PERSPECTIVE, RESTRICTIONS ON INMATE PROPERTY, INCLUDING RELIGIOUS PROPERTY, HAVE BEEN CONTINUALLY NECESSARY. (AFFIDAVIT OF MARC W. CLEMENS, 3·24·11, P. 10, ¶ 51; AFFIDAVIT OF DANIEL A. WESTFIELD, 3·24·11, P. 10, ¶ 48)

100. NO DISPUTE

101. THE COMMITTEE CONSIDERED THAT THERE ARE INNUMERABLE POTENTIAL "RELIGIOUS" PROPERTY ITEMS AND VARIATIONS OF CURRENTLY APPROVED RELIGIOUS PROPERTY ITEMS, ESPECIALLY GIVEN THE HIGH NUMBER OF DIFFERENT RELIGIONS AND RELIGIOUS SECTS PRACTICED BY WISCONSIN INMATES. (AFFIDAVIT OF MARC W. CLEMENS, 3·24·11, P. 10, ¶ 52; AFFIDAVIT OF DANIEL A. WESTFIELD, 3·24·11, P. 10, ¶ 49)

101. DISPUTE. THIS SUIT ~~A~~ REVOLVES AROUND RELIGIOUS PROPERTY IN PART AT GBCI OR NOT AT GBCI AND THEN WI DOC AVAILABILITY OF A PROPERTY ITEM ALREADY APPROVED - THOR'S HAMMER AMULET - BUT JUST NOT FOR SEGREGATION. (COMPLAINT, DOCKET # 15, P. 7, ¶ 53, 56)

102. GIVEN THE FACTORS ADDRESSED ABOVE THE TREND OVER THE YEARS IN REGARDS TO INMATE PROPERTY HAS BEEN TO START RESTRICTING THE NUMBER OF PERSONAL PROPERTY ITEMS; TO PLACE LIMITS ON THE TOTAL

Amount of inmate property allowed; to go to sole or limited source(s) vendors, and to make property items more uniform. (Affidavit of Marc W. Clements, 3-24-11, p.10, ¶53; Affidavit of Daniel A. Westfield, 3-24-11, p.10, ¶56)

102. No Dispute.

103. It was important to the committee and DAI to adhere to this trend when revising IMP #6A because of its collective impact on the security, management, and resources of DOC. (Affidavit of Marc W. Clement, 3-24-11, p.10, ¶54; Affidavit of Daniel A. Westfield, 3-24-11, p.10, ¶51)

103. No Dispute

104. To understand the issues of DOC involvement in the management of inmate property, and the need to minimize the allocation of staff time and resources in this area, the following is a summary of what does or could occur for each item of inmate property:

- The inmate must complete a form to request staff approval to purchase a property item;
- The staff member must review the request and approve or deny it consistent with applicable code provisions;
- Staff must ensure that the inmate has sufficient inmate account funds to purchase the item;
- The Business Office staff must process the approved form including issuing a check to the company from which the item is ordered;
- The order and check are mailed out and go through the mail room staff;
- When the property item comes in, it comes into the mailroom and property room and is handled by staff;
- The item has to be checked-in to ensure there is no contraband (in institutions this should include the property being X-rayed);
- There is a determination if the property meets the DOC 309 property policy requirements (allowable item including all of the specifications in the IMP for an allowable item size, feature, color, etc.);
- If the property item is not allowed, then it has to be held until the inmate decides whether or not to file an inmate complaint;
- If the property is not allowed or the inmate decides it is unacceptable (e.g. it doesn't fit,

-23-

POOR QUALITY, etc.), THEN THE ITEM HAS TO BE REPACKAGED AND RETURNED TO THE COMPANY FOR A REFUND;

• IF IT IS ACCEPTED FOR RETURN BY THE COMPANY, AND A REFUND CHECK IS ISSUED, THIS IS SENT TO THE INSTITUTION AND IS PROCESS BY THE MAIL ROOM STAFF AND ULTIMATELY BY THE BUSINESS OFFICE STAFF WHO DEPOSIT IT IN THE INMATE'S ACCOUNT;

• IF THE ITEM IS ALLOWED INTO THE INSTITUTION, THE ITEM MUST BE ADDED TO THE INMATE'S PROPERTY INVENTORY BY PROPERTY STAFF;

• THE HOUSING UNIT OFFICER STAFF MUST HAVE A RECORD OF THE ADDITION TO THE INMATE'S PROPERTY INVENTORY;

• IF THE NEW PROPERTY ITEM PUTS AN INMATE OVER THE ALLOWABLE PROPERTY AMOUNT, A CURRENT PROPERTY ITEM(S) HAS TO BE PACKED UP FOR MAILING OUT, STORED TO BE SENT OUT ON A VISIT, OR DESTROYED. ALL SUCH ITEMS MUST BE TAKEN OFF THE INMATE'S PROPERTY LIST;

• ANY TIME AN INMATE IS BEE RELEASED OR TRANSFERRED, EACH ITEM OF PROPERTY MUST BE INVENTORIED AND PACKED PRIOR TO THE RELEASE OR TRANSFER IN AN EFFORT TO ENSURE IT IS NOT BROKEN, IT IS THE INMATE'S PROPERTY, THE INMATE'S PROPERTY IS WITHIN ALLOWABLE LIMITS, etc.;

• IF THE INMATE IS TRANSFERRED, THE PROPERTY MUST BE UNPACKED AND RE-INVENTORIED AFTER THE INMATE ARRIVES AT THE NEW INSTITUTION TO ENSURE NOTHING HAS BEEN LOST OR BROKEN WHILE IT WAS UNDER STAFF CONTROL; AND

• SPECIFIC TO RELIGIOUS PROPERTY ITEMS, THE INSTITUTION CHAPLAIN AND/OR RELIGIOUS LEADER COULD BE CONTACTED AND CONSULTED WITH AT VARIOUS POINTS IN THE ABOVE PROCESS.

(AFFIDAVIT OF MARC W. CLEMENTS, 3-24-11, p. 55, AFFIDAVIT OF DANIEL A. WESTFIELD, 3-24-11, pp. 10-12, ¶ 52)

104. DISPUTE. BECAUSE A PRISONER CAN AND DOES HAVE FAMILY/FRIENDS ORDER ITEMS FOR HIM/HER, THE FIRST 5 POINTS ARE NULL AND VOID IN THAT INSTANCE. FURTHERMORE, BECAUSE THE DOC HAS GONE "TO SOLE OR LIMITED SOURCE(S) VENDORS" THE MAIL/PROPERTY ROOMS SEE IDENTICAL PROPERTY ITEMS FROM PREAPPROVED CATALOG ITEMS FROM THESE SAME/IDENTICAL VENDORS. (AFFIDAVIT OF DEREK S. KRAMER, EXHIBIT 26, SECTION A.4.; ~~DEFENDANT~~ DEFENDANTS PFOF ¶ 102)

105. IT IS NECESSARY IN A PRISON SETTING TO CONTROL, SEARCH, AND MONITOR INMATE PROPERTY ON A REGULAR BASIS FOR A VARIETY OF REASONS INCLUDING NUMEROUS FUNDAMENTAL SECURITY REASONS, SOME OF

WHICH ARE: TO CONTROL THEFT; MISUSE OF PROPERTY INCLUDING MAKING WEAPONS; BARTERING; PROPERTY BEING UTILIZED TO SIGNIFY GANG AFFILIATION; HIDING CONTRABAND; AND UNAUTHORIZED TRANSFER OF PROPERTY WHICH COULD BE THE RESULT OF STRONG-ARMING, GAMBLING OR OTHER DEBTS. (AFFIDAVIT OF Marc W. Clements, 3·24·11, p. 12, ¶ 36, AFFIDAVIT OF Daniel A. Westfield, 3·24·11, p. 12, ¶ 53)

103. No DISPUTE.

106. THE SECURITY NEED TO REGULARLY SEARCH INMATE CELLS/ROOMS IS FUNDAMENTAL IN A PRISON, AND THE MORE PROPERTY INMATES ARE ALLOWED, THE MORE PROBLEMATIC AND TIME CONSUMING THESE SEARCHES BECOME. (AFFIDAVIT OF Marc W. Clements, 3·24·11, p. 12, ¶ 57; AFFIDAVIT OF Daniel A. Westfield, 3·24·11, p. 12, ¶ 54)

106. DISPUTE. THERE COULD BE A MILLION PROPERTY OPTIONS AVAILABLE TO PRISONERS BUT BECAUSE THE DOC HAS ALREADY SET THE PROPERTY RULE, DAI Policy # 309.20.03, IN PLACE THEY HAVE SOLVED THE ISSUE OF ONE PRISONER HAVING "MORE PROPERTY" THAN ANOTHER. ALL PRISONERS ARE EQUAL UNDER DAI Policy# 309.20.03. (AFFIDAVIT OF Derek S. Kramer, 5·2·11, EXHIBIT 26, SECTION B.5)

107. THE USE OF UMBRELLA GROUPS MAKES CELL SEARCHES MORE EFFICIENT AND EFFECTIVE BY MAKING IT EASIER FOR STAFF TO RECOGNIZE CONTRABAND. (AFFIDAVIT OF Marc W. Clements, 3·24·11, pp. 12-13, ¶ 58; AFFIDAVIT OF Daniel A. Westfield, 3·24·11, p. 13, ¶ 55)

107. No DISPUTE.

108. BY REDUCING THE NUMBER OF DIFFERENT RELIGIOUS GROUPS, UMBRELLA GROUPS MAKE IT MUCH EASIER FOR STAFF TO BECOME FAMILIAR WITH WHAT TYPES OF PROPERTY AN INMATE WITH A SPECIFIC RELIGIOUS DESIGNATION SHOULD BE ALLOWED. (AFFIDAVIT OF Marc W. Clements, 3·24·11, pp. 12-13, ¶ 58, AFFIDAVIT OF Daniel A. Westfield, 3·24·11, p. 13, ¶ 55)

108. DISPUTE. PLAINTIFF HIGHLY DISPUTES WHAT TYPES OF PROPERTY AN ODINIST "SHOULD" HAVE OR "BE ALLOWED". FURTHERMORE, THE TERM "MUCH EASIER FOR STAFF" IS VAGUE, SELF SERVING, AND ASKS FOR CONJECTURE ON THE READER WHEN IT MAY BE JUST AS EASY TO BECOME FAMILIAR WITH THE INDIVIDUAL AND/OR GROUP RELIGIOUS ITEMS THE PLAINTIFF CITES IN THIS MATTER. THE FEDERAL BUREAU OF PRISONS (BOP) SEEMS TO HAVE MADE THE TRANSITION EASY ENOUGH AND THEIR PRISON SYSTEM ENGULFS WISCONSIN'S IN ITS ENORMITY. (AFFIDAVIT OF

-25-

Derek S. Kramer, 5.2.11, p.78, ¶ 30, p.9, ¶ 35, Exhibit 6, p.4-6, ¶ 2.A.,B.; Affidavit of Laurel M. Owen-Schtari, 12.27.10, p.4, ¶14, Attachment B)

109. The need to control the amount of property is also related to health and safety concerns including the potential for fire hazards and roommate relations if cells/rooms become overcrowded given the significant amount of double-celling that is occurring with overcrowding. (Affidavit of Marc W. Clements, 3.24.11, p.13, ¶ 59; Affidavit of Daniel A. Westfield, 3.24.11, p.13, ¶56)

109. No Dispute

110. DOC provides the inmates in the general population with the opportunity to individually practice their religious faith through individual study, personal meditation, religious books and literature and approved religious property. (Affidavit of Marc W. Clements, 3.24.11, p.13, ¶ 60; Affidavit of Daniel A. Westfield, 3.24.11, p.13, ¶ 57)

110. Dispute. The DOC does not give the plaintiff the opportunity to individually practice Odinism. (See Plaintiff's Response in ¶ 68)

111. Pursuant to DAI Policy # 309.61.02, the Pagan group may possess one of the following emblems total, in accordance with inmates designated religious preference for group use. The approved emblems for inmates in the Pagan group to choose from are Ogham-Rectangular, Triangle Pendant, Triskele-3 circles connected, Pentagram (a 5-point star in the upright position, stamped on a disc or printed in a circle) or Thor's Hammer (unadorned; minimal etchings). The emblem may not exceed 2" in length by 2" in width by ⅛" in depth or weigh more than 2 ounces. The emblem must be a single unit which cannot be disassembled, except it may have a single link to which a necklace can be affixed (the link shall not be counted in the assessment of size but if not detachable will be counted as part of the weight). The emblem lanyard may not be made of glass or ceramic. Inmates in the Pagan group may also possess an emblem lanyard, rexlace lacing craft (black only: flat, solid 3/32" plastic lacing, not to exceed 30"). (Affidavit of Marc W. Clements, 3.24.11, p.13, ¶61; Affidavit of Daniel A. Westfield, 3.24.11, p.13, ¶58)

111. No Dispute.

112. The Pagan group is also allowed for group use an electric or wax candle and wax candle holder, no larger than 4"x 6" (as appropriate for each religion). They are allowed audio/videotapes (as appropriate for each Umbrella Group), electronic equipment, cassette, CD player, TV, etc. (as appropriate for each Umbrella Group), altar cloth/paraments (as appropriate for each Umbrella Group), available musical instruments, including drums, drumsticks, padded mallet and rattles (specific to each Umbrella Group), table/altar, lectern/podium (as appropriate for each Umbrella Group), stand for religious books/publications (as appropriate for each Umbrella Group), religious art (approved pictures of signs, symbols or other identifiers used to identify each particular religion), and wine (up to 2 ounces in a clear plastic vial, must be checked in on each occasion by security staff. Under no circumstances will sacramental wine/beverage (alchoholic or non-alchoholic) be given to offenders outside of religious service. Religious services include communion during pastoral visits). (Affidavit of Marc W. Clements, 3·24·11, p. 13-14, ¶ 62; Affidavit of Daniel A. Westfield, 3.24.11, p.14, ¶ 59)

112. No Dispute

113. The Pagan group may also possess a bell (1 small, not to exceed 6" in height), cauldron (size varies - generally carried in and out by spiritual leader each visit), chalice (spiritual leader will bring in one chalice but may bring in two chalice's if service includes "community cup" offering), feather (any bird feather except eagle, hawk or owl feather, no larger than 16 inches in length. Limit 1. No animal carcass), incense sticks, incense holders, sage and burner, lighter (Incense- two incense sticks per service; sage -small amount to be burned during service. Allowed to be burned according to facilities' ignition device policy as well as fire codes, lighter - must remain under staff or spiritual leader control at all times. If spiritual leader maintains control, lighter must be checked in and out at start and conclusion of service), pentagram (to be displayed on altar cloth only, size not to exceed 24" in diameter), salt & pentacle dish (used during ceremony), and wooden wand (wood dowel/small branch/cardboard, no longer than 12"). (Affidavit of Marc W. Clements, 3·24·11, p. 14, ¶ 63; Affidavit of Daniel A. Westfield, 3·24·11, pp. 14-15, ¶ 60)

113. No Dispute.

114. Inmates in the Pagan group are allowed for personal use an emblem, a rexolace lacing craft lanyard, religious books/publications, religious art, oil for religious purposes (one of the four approved scents in a 1-ounce plastic bottle: Frankincense, Ferdous, Sandalwood, or Somali Rose, and one bottle at time), Book of Shadows Holy Book, calendar, feather and a reflective surface pursuant to the rules set forth in DAI Policy #309.61.02 and Religious Property Chart. (Affidavit of Marc W. Clement, 3.24.11, pp. 14-15, ¶64; Affidavit of Daniel A. Westfield, 3.24.11, p. 15, ¶61)

114. No dispute.

115. The placement of an inmate in segregation status is the DOC's response to the inmate's inability to follow the DOC's disciplinary rules. It removes the individual from the general population and in doing so, restricts the individual's freedom of movement, property and access to services, programs and privileges. (Affidavit of Marc W. Clements, 3.24.11, p. 15, ¶65; Affidavit of Daniel A. Westfield, 3.24.11, p. 15, ¶62)

115. No dispute.

116. It is essential for the safety and security of inmates and staff to restrict the amount of property to which inmates assigned to segregation status have access. (Affidavit of Marc W. Clements, 3.24.11, p. 15, ¶66; Affidavit of Daniel A. Westfield, 3.24.11, p. 15, ¶63)

116. No dispute

117. The primary reason for segregation placement is to separate inmates who demonstrate a willingness not to follow DOC rules from those inmates who do. (Affidavit of Marc W. Clements, 3.24.11, p. 15, ¶67; Affidavit of Daniel A. Westfield, 3.24.11, pp. 15-16, ¶64)

117. No dispute.

118. Inmates housed in segregation include inmates who present a substantial risk to another person, self or institutional security as evidenced by their behaviors or history of homicidal, assaultive, or other violent behavior or by an attempt or threat to cause harm. (Affidavit of Marc W. Clements, 3.24.11, p. 15, ¶67; Affidavit of Daniel A. Westfield, 3.24.11, p. 15-16, ¶64)

118. No dispute.

119. Placement in segregation is the least restrictive method of providing a safe and secure environment for staff and inmates alike in response to inmates who present these substantial risks.

(Affidavit of Marc W. Clements, 3·24·11, p. 15, ¶67; Affidavit of Daniel A. Westfield, 3·24·11, p. 15-16, ¶64)

120. The value of segregation placement depends on consistant application of the principle that good conduct will be rewarded with greater freedom and privileges, and bad conduct will be addressed with a reduction in freedom and privileges. (Affidavit of Marc W. Clements, 3·24·11, p. 15, ¶67; Affidavit of Daniel A. Westfield, page 3·24·11, p. 15-16, ¶64)

120. No dispute.

121. Based on the experience of Mr. Clements and Mr. Westfield, inmates in segregation have a tendency to misuse property items to create instruments of escape or weapons, and have used such weapons to attack staff as well as to commit self-harm. For this reason, strict limits must be placed on allowable property for inmates in segregation. (Affidavit of Marc W. Clements, 3·24·11, p. 15, ¶68; Affidavit of Daniel A. Westfield, 3·24·11, p. 16, ¶65)

121. No dispute.

122. RPAC was required to balance the amount of religious property allowed to inmates in segregated status with the personal property that segregated inmates were by law entitled to have in their cells as personal property. (Affidavit of Marc W. Clements, 3·24·11, p. 16, ¶69; Affidavit of Daniel A. Westfield, 3·24·11, p. 16, ¶66)

122. Dispute. Plaintiff reads this statement as vague, self serving and provides no factual basis or exhibits to prove what RPAC allowed to inmates in segregated status has anything to do with some "law" or what that "law" entails. (Affidavit of Marc W. Clements, 3·24·11, p. 16, ¶69; Affidavit of Daniel A. Westfield, 3·24·11, p. 16, ¶66)

123. Wisconsin Administrative Code §§ 303.69, 303.70 and 303.71 require DOC correctional institutions to provide all inmates assigned to specific segregation statuses a certain amount of non-religious property, mattress and bedding, adequate clothing, essential hygiene supplies, nutritionally adequate meals, to send and receive first class mail/correspondence, and writing materials and stamps. (Affidavit of Marc W. Clements, 3·24·11, p. 16, ¶70; Affidavit of Daniel A. Westfield, 3·24·11, p. 16, ¶68)

123. No dispute.

124. Pursuant to DAI Policy #309.61.02 and the Religious Property Chart dated July 26, 2010,

- 29 -

INMATES IN SEGREGATION MAY POSSESS FOUR SOFT-COVER BOOKS OR PUBLICATIONS OF THEIR CHOOSING. (AFFIDAVIT OF MARC W. CLEMENTS, 3.24.11, P. 16, ¶ 71; AFFIDAVIT OF DANIEL A. WESTFIELD, 3.24.11, P. 16, ¶ 68)

124. NO DISPUTE.

125. PRISON AUTHORITIES HAVE LIMITED OPTIONS WHEN TRYING TO CREATE INCENTIVES FOR INMATES TO FOLLOW THE RULES AND MODIFY PROBLEMATIC BEHAVIORS. THIS IS BECAUSE CONFINEMENT NECESSARILY RESTRICTS MANY RIGHTS, PRIVILEGES AND PROPERTY. (AFFIDAVIT OF MARC W. CLEMENTS, 3.24.11, P. 16, ¶ 72; AFFIDAVIT OF DANIEL A. WESTFIELD, 3.24.11, PP. 16-17, ¶ 69)

125. NO DISPUTE

126. IF DOC STAFF IS TO HAVE ANY SUCCESS IN MODIFYING AN INMATE'S PROBLEMATIC AND DANGEROUS BEHAVIORS THROUGH THE DISCIPLINARY PROCESS AND PLACEMENT IN SEGREGATION, DOC MUST CREATE AN ENVIRONMENT THAT PROVIDES INCENTIVES FOR GOOD BEHAVIOR AND ALLOWS INMATES TO ACHIEVE MORE PRIVILEGES AS A REWARD. THEREFORE, LIMITING INMATE RELIGIOUS PROPERTY, AS WELL AS OTHER TYPES OF PROPERTY, WHILE IN SEGREGATION HAS BEEN DETERMINED TO BE THE LEAST RESTRICTIVE MEANS OF ACHIEVING THESE GOALS. (AFFIDAVIT OF MARC W. CLEMENTS, 3.24.11, P. 16, ¶ 72; AFFIDAVIT OF DANIEL A. WESTFIELD, 3.24.11, PP. 16-17, ¶ 69)

126. DENIAL. STATEMENT ~~CLAIMING THAT DEFENDANTS DETERMINED~~ THAT LIMITING "RELIGIOUS PROPERTY" IS "LEAST RESTRICTIVE MEANS OF ACHIEVING THESE GOALS" IS NOT SUPPORTED BY FACT OR LAW AND THEREFORE IS SOLELY SELF SERVING. (AFFIDAVIT OF MARC W. CLEMENTS, 3.24.11, P. 16, ¶ 72; AFFIDAVIT OF DANIEL A. WESTFIELD, 3.24.11, PP. 16-17, ¶ 69)

127. ADDITIONALLY, LIMITING ALLOWABLE PROPERTY TO SEGREGATION INMATES IN GENERAL, WHEN SEGREGATION INMATES ARE KNOWN TO USE PERSONAL PROPERTY ITEMS TO FASHION ESCAPE TOOLS AND WEAPONS, HAS BEEN DETERMINED TO BE NECESSARY TO PROTECT THE SAFETY AND SECURITY OF INMATES, STAFF, AND THE INSTITUTION. (AFFIDAVIT OF MARC W. CLEMENTS, 3.24.11, P. 16, ¶ 72; DANIEL A. WESTFIELD, 3.24.11, PP. 16-17, ¶ 69)

127. NO DISPUTE.

128. IF INMATES WHO HAVE DEMONSTRATED AN INABILITY TO FOLLOW RULES, AND SUBSEQUENTLY ARE PLACED IN SEGREGATION STATUS, WERE TO HAVE ACCESS TO THE SAME PERSONAL PROPERTY ITEMS AND/OR RELIGIOUS PROPERTY ITEMS AS THOSE INMATES IN GENERAL POPULATION, IT WOULD BE A DISINCENTIVE TO FOLLOWING DOC's DISCIPLINARY RULES AND WOULD ALSO PRESENT SAFETY AND SECURITY RISKS TO INMATES, STAFF, AND THE INSTITUTION. THE VERY BASIC LESSON OF THE PRISON SYSTEM ——— BETTER CONDUCT IS REWARDED WITH MORE PRIVILEGES — WOULD BE

UNDERMINED. (Affidavit of Marc W. Clemens, 3-24-11, p.17, ¶74; Affidavit of Daniel A. Westfield, 3-24-11, p.17, ¶71)

130. DISPUTE. Matter at hand does not deal with allowing prisoners on segregated status to have "that same property" as general population prisoners. Plaintiff merely wants his Thor's Hammer amulet to be given the same allowable property status as a Rosary, Medicine Bag, or Prayer Beads which are all allowed to prisoners on segregated statuses. (Affidavit of Derek S. Kramer, 5-2-11, pp. 13-14, ¶57-59, p.14, ¶60-61)

131. The security need to regularly search inmate cells/rooms is fundamental in a prison, and the more property inmates are allowed, the more problematic and time consuming these searches become. (Affidavit of Marc W. Clemens, 3-24-11, p.17, ¶75; Affidavit of Daniel A. Westfield, 3-24-11, p. 17-18, ¶72)

131. DISPUTE. Matter at hand is not to request "more property" but rather to allow his Thor's Hammer amulet into segregation in replace of the cloth/paper picture of a Thor's Hammer that petitioner is now allowed. A trade of property, in a sense, one for one — not "more property." (Affidavit of Derek S. Kramer, 5-2-11, pp. 13-14, ¶59, p. 14, ¶60, Affidavit of Marc W. Clemens, 3-24-11, Exhibit 101 - DAI Religious Property Chart, Specification or Description and Purpose, "Seg:", page 1 of 10)

132. If inmates had access to voluminous property, it could make searches of inmate cells more difficult. Security staff only have a limited window of opportunity to search the cells of inmates housed in segregation because many times these searches are done when the inmate is in the shower or at recreation. (Affidavit of Marc W. Clemens, 3-24-11, p.17, ¶75; Affidavit of Daniel A. Westfield, 3-24-11, pp.17-18, ¶72)

132. DISPUTE. Plaintiff disagrees with term "voluminous property" as plaintiff is not requesting "voluminous property". See Plaintiff's Responses in ¶130-131.

133. The more property that segregated inmates have, the more difficult and time consuming it is for staff to conduct searches to ensure that no contraband is hidden. (Affidavit of Marc W. Clemens, 3-24-11, p.17, ¶75; Affidavit of Daniel A. Westfield, 3-24-11, pp. 17-18, ¶72)

133. DISPUTE. See Petitioner's Response in ¶131.

134. There are significant security-related differences between religious emblems, the use and possession of which is governed by the DAI Religious Property Chart, Attachment to DAI Policy #309.61.02, Pages 1-2, and which are not permitted to inmates in segregation, and other religious property

THAT IS PERMITTED TO INMATES IN SEGREGATION SUCH AS EASTERN RELIGION PRAYER BEADS, CATHOLIC ROSARY, ISLAM PRAYER BEADS, AND NATIVE AMERICAN MEDICINE BAGS. (AFFIDAVIT OF DANIEL A. WESTFIELD, 4.8.11, p.1, ¶13)

134. DISPUTE. "SIGNIFICANT SECURITY-RELATED DIFFERENCES RELIGIOUS EMBLEMS... AND OTHER RELIGIOUS PROPERTY... SUCH AS... PRAYER BEADS,... ROSARY,... MEDICINE BAGS" IS NOT DISPLAYED ON "PAGES 1-2" OF THE "RELIGIOUS PROPERTY CHART". ON PAGE 1 OF THIS CHART IT STATES EMBLEMS CANNOT BE MADE OF "GLASS OR CERAMIC" AND THAT SEEMS TO BE THE ONLY DIFFERENCE IN POSSIBLE MATERIALS AN EMBLEM OR "OTHER RELIGIOUS PROPERTY". FURTHERMORE, EMBLEMS ARE GIVEN A RESTRICTIVE MEASUREMENT STANDARD - 2"x 2" x 1/8" AND WT. NO MORE THAN 2 oz. - WHEREAS A ROSARY (WHICH IS ALLOWED IN SEGREGATION) CAN HAVE BEADS 1/2" IN DIAMETER, BE 45" IN LENGTH AND HAS NO RESTRICTION ON THE CROSS ATTACHED TO/PART OF THE ROSARY (4", 5"? AN INCH IN WIDTH?) EXCEPT THAT IT HAS TO BE MADE OF SOME TYPE OF WOOD OR SOME TYPE OF PLASTIC (CITED ON PAGE 4 OF 10 OF THE RELIGIOUS PROPERTY CHART). IF ANYTHING THERE'S A "SIGNIFICANT SECURITY-RELATED DIFFERENCES" BETWEEN WHAT IS ALLOWED IN SEGREGATION AND WHAT THE PLAINTIFF IS REQUESTING. (AFFIDAVIT OF DEREK S. KRAMER, 5.2.11, p.14, ¶16; AFFIDAVIT OF MARC W. CLEMONTS, 3.24.11, EXHIBIT 101 - RELIGIOUS PROPERTY CHART, p.1, p.4) (PLAINTIFF'S EXHIBIT 15, p.35 OF 72)

135. RELIGIOUS EMBLEMS, WHICH, AS EXAMPLES, MAY INCLUDE A CROSS FOR CATHOLIC INMATES, A STAR OF DAVID FOR JEWISH INMATES, A THOR'S HAMMER FOR PAGAN INMATES, OR A CRUCIFIX FOR PROTESTANT INMATES, ARE OFTEN MADE OF A SOLID PIECE OF METAL AND CAN BE UP TO TWO INCHES IN LENGTH AND WEIGHT UP TO TWO OUNCES. MANY SUCH EMBLEMS CONTAIN SHARP EDGES, OR COULD EASILY BE FILED DOWN TO CREATE SHARP EDGES OR POINTS, AND THEREFORE CAN BE AND HAVE BEEN HIDDEN AND USED BY INMATES AS WEAPONS. (AFFIDAVIT OF DANIEL A. WESTFIELD, 4.8.11, p.2, ¶14)

135. DISPUTE. PLAINTIFF DISAGREES THAT EMBLEMS ARE "OFTEN MADE OF A SOLID PIECE OF METAL". DEFENDANTS PROVIDE NO FACTUAL OR EXHIBITION TO PROVE THIS SELF SERVING COMMENT. FURTHERMORE, A RESTRICTION OF MATERIAL (METAL) WOULD NULLIFY THIS SECURITY ISSUE JUST AS THEY ALLOW ROSARIES OF A WOOD/PLASTIC TYPE - WITH NO WEIGHT RESTRICTIONS OR HOW BIG THE CROSS ON THE ROSARY MAY BE. (SEE PLAINTIFF'S RESPONSE IN ¶134)

136. THE STANDARDS DESIGNED OF CERTAIN RELIGIOUS EMBLEMS, SUCH AS A CROSS, CRUCIFIX, OR THOR'S HAMMER, IS PARTICALLY ~~PARTICULARLY~~ A READY-MADE WEAPON AND HAS BEEN USED BY INMATES AS SUCH.

(Affidavit of Daniel A. Westfield, 4.8.11, p.2, ¶4)

136. DISPUTE. SEE PLAINTIFF'S RESPONSE IN ¶s 134-135.

137. Small metal items such as Religious emblems can be and have been used by inmates to create a tool with which to cut themselves and commit self-harm. (Affidavit of Daniel A. Westfield, 4.8.11, p.2, ¶5)

137. DISPUTE. Plaintiff disputes the statement "such as Religious emblems" in reference to "small metal items." The DOC does not mandate that Religious emblems be made of metal. They can be bone, stone, wood, etc. Just Not made of "glass or ceramic." This reference made by Mr. Westfield and defense is conjecture and self-serving to the defense without having a factual basis. (Affidavit of Marc W. Clements, 3.24.11, Exhibit (0)- Religious Property Chart, p. 1 of 10)

138. Inmates not only have used small metal items such as Religious emblems items to harm themselves, but also have found ways to pass such small items to other inmates who then may use the item to commit self-harm. (Affidavit of Daniel A. Westfield, 4.8.11, p.2, ¶5)

138. DISPUTE. See Plaintiff's Response in ¶ 137

139. Inmates in segregation, in particular, have demonstrated an increased tendency to use any available metal items to commit self-harm. (Affidavit of Daniel A. Westfield, 4.8.11, p.2, ¶5)

139. DISPUTE. Concerning "metal items" in reference to a Thor's Hammer see Plaintiff's Response in ¶ 137.

140. It is critical that inmates in segregation have significant restrictions placed on their access to small, metal items such as Religious emblems. (Affidavit of Daniel A. Westfield, 4.8.11, p.2, ¶5)

140. DISPUTE. See Plaintiff's Response in ¶ 137.

141. The Catholic Rosary and Islam and Eastern Religion prayer beads must be made of wood or plastic, with beads no larger than ½ inch in diameter. (Affidavit of Daniel A. Westfield, 4.8.11, p.2, ¶6)

141. DISPUTE. While Rosaries must be made of wood/plastic there is no restriction on the size of the cross attached. (See Plaintiff's Response in ¶ 134)

142. A Native American medicine bag is a soft pouch that is sewn shut (Affidavit of Daniel A. Westfield, 4.8.11, p.2, ¶6)

-33-

142. DISPUTE. Medicine bags may contain a pebble(s) of unrestrictive size long as the bag itself does not weigh more than 2 ounces. (Affidavit of Kyle J. Boner, 7·22·10, p. 2, ¶8, Affidavit of Marc W. Clements, 3·24·11, Exhibit 101 - Religious Property Chart, p. 7 of 10)

143 The design of the rosary, prayer beads, and medicine bag that are approved for inmate possession is not such that the items could easily be hidden and used as a weapon or fashioned into a weapon, or used to commit self-harm, and therefore these items are dissimilar from religious emblems. (Affidavit of Daniel A. Westfield, 4.8.11, p.2, ¶6)

143. DISPUTE. ~~This statement and this prohibition and Mr. Westfield to be conjecture, misleading and self-serving~~ ~~(Affidavit of Derek S. Kramer)~~. Nothing prohibits a Thor's hammer from being made of bone, stone or wood thus being similar to a rosary (with a cross attached), prayer beads, or a medicine bag (with an undetermined in size "pebble") which Mr. Westfield swears are "not such that the items could easily be hidden and used as a weapon or fashioned into a weapon" etc. Plaintiff sees this statement by Mr. Westfield and the Defense as conjecture, misleading and self serving. (Affidavit of Derek S. Kramer, 5·2·11 Exhibit 15, p. 24 of 72, p. 35 of 72, p. 41 of 72, and p. 53 of 72; Affidavit of Marc W. Clements, 3·24·11, Exhibit 101 - Religious Property Chart, p. 1 of 10, p. 3-5 of 10, and 7 of 10; Affidavit of Daniel A. Westfield, 4·8·11, p.2, ¶6)(Plaintiff's Exhibit 33, Admissions of Peter Huibregtse, p. 4, ¶19, p.5, ¶20-21)

144. The prohibition on the possession of religious emblems to inmates in segregation, and the substitution of a paper or cloth picture of the emblem to inmates in segregation, applies equally to inmates of all religions. (Affidavit of Daniel A. Westfield, 4·8·11, p.2, ¶7)

144. No Dispute.

145. Inmates housed in segregation include inmates who present a substantial risk to another person, self or institution security as evidenced by their behaviors or history of homicidal, assultive, or other violent behavior or by an attempt or ~~threat~~ threat to cause harm. (Affidavit of Daniel A. Westfield, 4·8·11, p. 3, ¶8)

145. No Dispute.

146. Inmates in segregation have a tendency to misuse property items to create instruments of escape or weapons, and have used such weapons to attack staff as well as to commit self-harm. (Affidavit of Daniel A. Westfield, 4·8·11, p. 3, ¶8)

146. No Dispute.

147. Strict limits must be placed on allowable property for inmates in segregation, and especially property items that can and have been easily fashioned into a weapon, such as religious emblems. (Affidavit of Daniel A. Westfield, 4.8.11, p.3, ¶18)

147. Dispute. Plaintiff disputes statement "such as religious emblems." (See plaintiff's response in ¶143)

148. The prohibition on the possession of religious emblems to inmates in segregation is the least restrictive means of furthering compelling government interests, including maintaining the safety of staff and inmates. (Affidavit of Daniel A. Westfield, 4.8.11, p.3, ¶18)

148. Dispute. Plaintiff and other DOC prisoners have offered other less restrictive means but these offers have been denied. Defendants could do as follows:

A. Put a tag on the prisoners door (much like the "prayer oil" tag used by WSPF ~~████████~~) notifying staff that the prisoner possesses a Thor's Hammer and require prisoner to show Thor's Hammer before leaving the cell.

B. Approve a wood, stone, or bone Thor's Hammer (similar to rosaries, prayer beads or medicine bags) ~~████████████~~ emblem to be allowed in segregation.

C. A combination of A. and B.

D. Change the Thor's Hammer to the status similar to rosaries, prayer beads or medicine bags. Anotherwords, not an "emblem" but an individual religious item/ tool.

E. Allow donated wooden Thor's Hammers to be held by Chaplain and given to segregated prisoner upon written request (thus keeping a prisoner's own Thor's Hammer in his stored general population property)

F. Put a tag on the prisoners door who have receive a pre-approved donated wooden Thor's Hammer when chaplain gives said Thor's Hammer to prisoner and return Thor's Hammer back to chaplain once finished with segregation time.

G. A combination of E and F.

H. Same as prison officials might do to someone who abuses the ability to possess a rosary, prayer beads, or medicine bag, take it away.

(Affidavit of Derek S. Kramer, 5·2·11, p. 13, ¶ 58, Exhibit 31, p.3.a.b., Exhibit 44, p.4, ¶ 3; Exhibit 45, a.b.; Affidavit of J. Osmond Siebalour Daer-Baker, 8·9·2009, pp. 3-4, ¶ 19; Affidavit of Matthew Knapp, 4·1·11, p. 3, ¶ 9; Affidavit of Theodore J. Hawver, 2·4·11, p. 4, ¶ 23)

149. When determining allowable religious property for inmates housed in segregation, it is also necessary for the RPAC committee members to consider the general personal property that all inmates are entitled to have pursuant to Wisconsin Administrative Codes. Other legal and basic needs of the inmate must be balanced with religious needs when determining how to restrict property and create incentives for segregated inmates. (Affidavit of Marc W. Clements, 3·24·11, pp. 17-18, ¶ 76; Affidavit of Daniel A. Westfield, 3·24·11, p.18, ¶ 73)

149. No dispute.

150. Inmates in segregation are not allowed to go to group meetings due to their status. (Affidavit of Marc W. Clements, 3·24·11, p.18, ¶ 77; Affidavit of Daniel A. Westfield, 3·24·11, p.18, ¶ 74)

150. No dispute.

151. Inmates in segregation status have an opportunity to practice their faith but have restrictions based upon the nature of that status, as well as the security and resource needs of the facility (Affidavit of Marc W. Clements, 3·24·11, p.18, ¶ 78; Affidavit of Daniel A. Westfield, 3·24·11, p.18, ¶ 75)

151. Dispute. Plaintiff disputes that he or other Odinist "have an opportunity to practice their faith ... based upon ... the security and resource needs of the facility." Plaintiff (and Odinist state-wide) is not allowed his Thor's Hammer amulet in segregation and these amulets are used to perform personal rituals, hallow food/drink and personal meditation/study space, as well as protect him from ill will (what a non-Odinist might identify as "evil"). With readily available alternatives "security and resource needs" are addressed. (Affidavit of Derek S. Kramer, 5·2·11, p. 12, ¶ 52, p. 13, ¶ 55-56, p.14, ¶ 60; Also see Plaintiff's Response in the above ¶ 148)

152. Inmates in segregation may participate in individual religious activities including individual study and personal meditation in their assigned quarters. (Affidavit of Marc W. Clements, 3·24·11, p.18, ¶ 78;

Affidavit of Daniel A. Westfield, 3·24·11, p.18, ¶75)

152. DISPUTE. Plaintiff disputes that he can "participate in individual religious practice" in segregation. (See Plaintiff's Response in ¶151)

153. Inmates in segregation also may also have access to authorized literature, property, DOC chaplains, institution staff and pastoral visits as approved by the institution and DOC rules. (Affidavit of Marc W. Clements, 3·24·11, p.18, ¶78; Affidavit of Daniel A. Westfield, 3·24·11, p.18, ¶75)

153. No Dispute.

154. The Chaplains conduct regular rounds in the HSC (Health and Segregation Complex) building to allow the inmates in segregation status a chance to speak with a Chaplain or Spiritual Leader for spiritual counseling and support. Inmates wishing to speak with a specific Chaplain must submit an "Interview/Information Request" form to the Chapel. The Chaplain will stop by the inmate's cell front (Affidavit of Marc W. Clements, 3·24·11, p.18, ¶79; Affidavit of Daniel A. Westfield, 3·24·11, p.18, ¶76)

154. No Dispute.

155. Pagan inmates in segregation may possess for personal use one emblem that is a paper or cloth picture of the emblem, and 1 soft cover copy of the Book of Shadows, or an equivalent religious book such as a personal journal or workbook or a commercially manufactured logbook/notebook with no spiral binding. (Affidavit of Marc W. Clements, 3·24·11, p.18, ¶80; Affidavit of Daniel A. Westfield, 3·24·11, pp.18-19, ¶77)

155. DISPUTE. Plaintiff disputes that "Pagan inmates in segregation may possess ... an equivalent religious book such as a personal journal or workbook or a commercially manufactured logbook/notebook with no spiral binding." This quote is just a discription of a Book of Shadows Holy Book and purpose of a Book of Shadows Holy Book. This is critical for Odinist because we do not use a Book of Shadows Holy Book and Runes are only allowed by DOC to be written in a Book of Shadows Holy Book and this is why Plaintiff attempted to have "Galdrbook"/Personal Journal" listed as a "Religious Item" in the DOC 309 IMP 6A (Now DAI Policy# 309.61.02 - Attachment, Religious Property Chart). (Affidavit of Derek S. Kramer, 5·2·11, Exhibit 8(c), pp.1A, 1B; Exhibit 1C(c), "Chaplain recommendation", Exhibit 1T, p.1 "2. Religious items" ("Wicca, page 2"); Affidavit of Marc W. Clements, 3·24·11, p.19, ¶81; Affidavit of Daniel A. Westfield, 3·24·11, p.19, ¶78, Affidavit of Marc W. Clements,

3-24-11, EXHIBIT 101 - ATTACHMENT - RELIGIOUS PROPERTY CHART, p. 9 OF 10)

156. IN ACCORDANCE WITH INDIVIDUAL OFFENDER SEGREGATION RESTRICTIONS, INMATES IN SEGREGATION FROM THE PAGAN GROUP ARE ALLOWED ONE OF THE FOUR APPROVED SENSES IN A 1-OUNCE PLASTIC BOTTLE: FRANKINCENSE, FERDOUS, SANDALWOOD, OR SOMALI ROSE. THE INMATES ARE ONLY ALLOWED TO POSSESS ONE BOTTLE AT TIME. THEY MAY ALSO POSSESS RELIGIOUS ART OF APPROVED PICTURES OF SIGNS, SYMBOLS, OR OTHER IDENTIFIERS USED TO IDENTIFY EACH PARTICULAR RELIGION. (AFFIDAVIT OF MARC W. CLEMENTS, 3-24-11, p. 18, ¶80; AFFIDAVIT OF DANIEL A. WESTFIELD, 3-24-11, pp. 18-19, ¶77)

156. NO DISPUTE.

157. RUNES WILL NOT BE ALLOWED IN ANY FORM OTHER THAN PERSONAL WRITINGS IN THE HOLY BOOK OF SHADOWS AND IN EDUCATIONAL BOOKS FROM THE PUBLISHER. (AFFIDAVIT OF MARC W. CLEMENTS, 3-24-11, p. 19, ¶81; AFFIDAVIT OF DANIEL A. WESTFIELD, 3-24-11, p. 19, ¶78)

157. NO DISPUTE.

158. INMATES MUST REFRAIN FROM USING SYMBOLS ASSOCIATED WITH UNSANCTIONED GROUPS. UNFORTUNATELY SOME RELIGIOUS SYMBOLS ARE ALSO USED BY UNSANCTIONED GROUPS. THIS IS NOT ISOLATED TO THE PAGAN GROUP. (AFFIDAVIT OF MARC W. CLEMENTS, 3-24-11, p. 19, ¶82; AFFIDAVIT OF DANIEL A. WESTFIELD, 3-24-11, p. 19, ¶79)

158. NO DISPUTE

159. THE "BOOK OF SHADOWS" CONTENTS ARE CREATED AND ACCORDINGLY CONTROLLED BY THE OWNER. AN INMATE WOULD ONLY HAVE ISSUES IF HE WERE DRAWING SYMBOLS ASSOCIATED WITH DISRUPTIVE GROUPS. (AFFIDAVIT OF MARC W. CLEMENTS, 3-24-11, p. 19, ¶82; AFFIDAVIT OF DANIEL A. WESTFIELD, 3-24-11, p. 19, ¶79)

159. NO DISPUTE.

160. THE REVISED RELIGIOUS PROPERTY CHART DATED APRIL 2007, WHICH WAS AN ADDENDUM TO DOC 309 IMP 6A, INCLUDED THE THOR'S HAMMER AS AN ALLOWED EMBLEM FOR DOC INMATES WHO DESIGNATED PAGAN AS THEIR RELIGIOUS PREFERENCE. (AFFIDAVIT OF MARC W. CLEMENTS, 3-24-11, p. 19, ¶83; AFFIDAVIT OF DANIEL A. WESTFIELD, 3-24-11, p. 19, ¶80)

160. NO DISPUTE.

161. THE "BOOK OF SHADOWS" HAS BEEN ESTABLISHED AS THE HOLY BOOK FOR THE PAGAN RELIGION. (AFFIDAVIT OF MARC W. CLEMENTS, 3-24-11, p. 19, ¶84; AFFIDAVIT OF DANIEL A. WESTFIELD, 3-24-11, p. 19, ¶81)

161. DISPUTE. THE "BOOK OF SHADOWS" IS A WICCAN HOLY BOOK NOT ODINIST/ASATRU SO PLAINTIFF

DISPUTES THE STATEMENT THAT THIS WICCAN BOOK IS THE "ESTABLISHED".. HOLY BOOK FOR THE PAGAN RELIGION" AND AS THE EASTERN RELIGIONS ARE PAGAN RELIGIONS PLAINTIFF NOTES THAT THEY TOO DO NOT RECOGNIZE THE "BOOK OF SHADOWS" AS THEIR "ESTABLISHED" HOLY BOOK. (AFFIDAVIT OF DEREK S. KRAMER, 5.2.11, EXHIBIT 6, p. 7, SECTION 7. SACRED WRITINGS, EXHIBIT 17, p. 1 "2. RELIGIOUS ITEMS"; AFFIDAVIT OF MARC W. CLEMENTS, 3.24.11, EXHIBIT 101 - ATTACHMENT- RELIGIOUS PROPERTY CHART, pp. 3-4 of 16.)

162. THE BOOK OF SHADOWS IS BLANK. IT CAN BE A JOURNAL, A FOLDER WITH LOOSE PAPERS, A LOGBOOK OR A NOTEBOOK (SPIRAL BINDING IS NOT ALLOWED). THE BOOK OF SHADOWS IS AN INDIVIDUAL AS THE PERSON MAKING IT. IT IS SUPPOSED TO CONTAIN THEIR OWN PERSONAL WRITINGS AND BE USED FOR PERSONAL MEDITATION. (AFFIDAVIT OF MARC W. CLEMENTS, 3.24.11, p. 19, ¶85; AFFIDAVIT OF DANIEL A. WESTFIELD, 3.24.11, p. 19, ¶82)

162. DISPUTE. PLAINTIFF DISPUTES VAGUE TERM "THEIR OWN". (SEE PLAINTIFF'S RESPONSE IN ¶161)

163. MR. CLEMENTS AND MR. WESTFIELD'S INVOLVEMENT IN RPAC REQUIRED THEM TO WORK WITH OTHER COMMITTEE MEMBERS AND CONSIDER THE RELIGIOUS PERSONAL PROPERTY TO WHICH INMATES SHOULD BE ALLOWED TO RETAIN IN THEIR CELLS TO ENSURE THAT THEY ARE ABLE TO PURSUE LAWFUL RELIGIOUS PRACTICES OF THE RELIGION OF THEIR CHOICE IN THE LEAST RESTRICTIVE MANNER. (AFFIDAVIT OF MARC W. CLEMENTS, 3.24.11, p.19, ¶86; AFFIDAVIT OF DANIEL A. WESTFIELD, 3.24.11, p. 20, ¶83)

163. NO DISPUTE.

164. RPAC IS COMPRISED OF NOT ONLY DOC ADMINISTRATORS, CHAPLAINS AND SECURITY STAFF, BUT COMMUNITY RELIGIOUS LEADERS ALSO TOOK AN ACTIVE ROLE IN THE ESTABLISHMENT OF ALLOWABLE PROPERTY, TAKING INTO CONSIDERATION THE LEAST RESTRICTIVE ALTERNATIVES. (AFFIDAVIT OF MARC W. CLEMENTS, 3.24.11, p.19, ¶86; AFFIDAVIT OF DANIEL A. WESTFIELD, 3.24.11, p. 20, ¶83)

164. NO DISPUTE

165. ADDITIONALLY, THE DOC HAS AN ESTABLISHED PRACTICE AND POLICY FOR INMATES TO FOLLOW WHEN REQUESTING A RELIGIOUS BELIEF AND ITEM OF PROPERTY THAT IS NOT ON THE ESTABLISHED RELIGIOUS PROPERTY CHART. AN INMATE MAY REQUEST AN ADDITIONAL RELIGIOUS PROPERTY ITEM BY SUBMITTING A DOC-2075, "REQUEST FOR NEW RELIGIOUS PRACTICE." THIS PROCESS WOULD PROVIDE AN INMATE WITH THE OPPORTUNITY TO CHALLENGE THE POLICY AS IT PERTAINS TO THE ALLOWANCE OF RELIGIOUS ITEMS WHILE IN A SEGREGATED STATUS. (AFFIDAVIT OF MARC W. CLEMENTS, 3.24.11, pp.19-20, ¶87; AFFIDAVIT OF DANIEL A. WESTFIELD, 3.24.11, p. 20, ¶84)

165. DISPUTE. PLAINTIFF DISPUTES THAT A DOC-2075 IS TO "CHALLENGE THE POLICY." IT IS THE

Plaintiffs understanding that a DOC-2075 is a "Request" whereas a DOC-400 is a Grievance/Complaint ("inmate complaint") challenging a Policy/issue/practice. (Affidavit of Derek S. Kramer, 5.2.11, Exhibit 13)

166. The submission of a DOC-2075 is an available administrative remedy for inmates seeking any type of religious property or practice not allowed in DAI Policy 309.61.01 or 309.61.02. A DOC-2075 form is the vehicle an inmate uses and DAI relies upon to bring any new religious issues before the RPAC for investigation and to assist them in making an informed decision. (Affidavit of Marc W. Clements, 3.24.11, p. 20, ¶88; Affidavit of Daniel A. Westfield, 3.24.11, p. 20, ¶85)

166. No Dispute.

167. No group can participate in activities that violate rules or jeopardize security. (Affidavit of Marc W. Clements, 3.24.11, p. 20, ¶89; Affidavit of Daniel A. Westfield, 3.24.11, p. 20, ¶86)

167. No Dispute.

168. Religious practice programming with DOC is based on resources, safety and security, and space and time available. (Affidavit of Marc W. Clements, 3.24.11, p. 20, ¶90; Affidavit of Daniel A. Westfield, 3.24.11, pp. 20-21, ¶87)

168. No Dispute.

169. One of the ideals commonly found within correctional institutions by inmates is the white supremacy belief that white people are superior to people of other racial backgrounds. Based on my experience in working with RPAC, I am aware that some white supremacist groups identify themselves as adherents of Oowism/Asatru. (Affidavit of Marc W. Clements, 3.24.11, p. 20, ¶90; Affidavit of Daniel A. Westfield, 3.24.11, pp. 20-21, ¶87)

169. Dispute. Plaintiff disputes the statement "commonly found" as vague, conjecture, self serving and an attempt to lead a reader to draw conclusions. Plaintiff is one of four white people on a range of 24 prisoners so "commonly found" seems ridiculous when the range is reflective of the prison population. (Affidavit of Marc W. Clements, 3.24.11, p.20, ¶90; Affidavit of Daniel A. Westfield, 3.24.11, p. 20-21, ¶87)

170. Although it is fair to say that not all Oowist/Asatru adherents are white supremacist, it would be too great of a risk to allow any group with this type of background to gather

AND GROW UNDER THE VEIL OF A LEGITIMATE RELIGIOUS UMBRELLA GROUP WITHIN DOC. (AFFIDAVIT OF MARC W. CLEMENTS, 3·24·11, p. 20, ¶ 90; AFFIDAVIT OF DANIEL A. WESTFIELD, 3·24·11, p. 20-21, ¶ 87)

170. DISPUTE! PLAINTIFF DISPUTES THAT "ODINIST/ASATRU ADHERENTS" ARE A "GROUP WITH THIS TYPE OF BACKGROUND" AND MR. CLEMENTS, MR. WESTFIELD AND THE DEFENDANTS PROVIDE NO EVIDENCE THAT ODINISM/ASATRU, AS A "GROUP", HAS A BACKGROUND OR THEOLOGY THAT SUPPORTS WHITE SUPREMACY. THIS IS BASELESS AND IN FACT AN INCITEFUL COMMENT THAT IS DISRESPECTFUL, BUT NOT SURPRISING. THE DEFENDANTS AND FORENAMED AFFIANTS STATE THAT "SOME WHITE SUPREMACIST GROUPS IDENTIFY THEMSELVES AS ADHERENTS OF ODINISM/ASATRU" BUT THIS SHOWS NO "BACKGROUND" OF ODINISM/ASATRU AS A GROUP ITSELF HOLDING THIS NON-RELIGIOUS BELIEF. FURTHERMORE, PLAINTIFF DISPUTES THE TERM "GROW UNDER THE VEIL" AS THERE IS NO EVIDENCE OF ODINISM/ASATRU AS A GROUP HOLDING THESE BELIEFS THE CANNOT BE UNDER SOME ALLEGED "VEIL". THIS COMMENT IS A REFLECTION OF THE DOC ADMINISTRATIVE BIGOTRY TOWARD ODINIST. THE ABOVE COMMENTS/TERMS ARE SELF SERVING AND NOT BASED ON FACT. LASTLY, PLAINTIFF DISPUTES THE ~~DEDU~~ STATEMENT "WITHIN DOC" AS THIS SUIT, CONCERNING UMBRELLA GROUP CONGREGATE SERVICES/ITEMS, IS NOT A DOC-WIDE ISSUE ADDRESSED BY THE COURT IN THIS MATTER. RATHER THIS IS A GBCI ISSUE SOLELY. (UNDERLINING "SOME" ADDED TO ADDRESS THE VAGUENESS HEREIN AND THE FACT THAT IT MIGHT BE INDIVIDUAL GROUPS THAT ARE ALREADY NOT ALLOWED WITHIN THE DOC. SEE PFOF ¶ 167) (AFFIDAVIT OF DEREK S. KRAMER, 5·2·11, EXHIBIT 12 p. 2, ¶ 6; AFFIDAVIT OF LAUREL M OWEN-SCHTARI, 12·27·10, p. 5, ¶ 17-18; ALSO SEE AFFIDAVIT OF DEREK S. KRAMER, 5·2·11, EXHIBIT 46, p. 5 (PAGE 10 OF DOCUMENT), ¶ 14)

171. WHITE SUPREMACIST GROUPS WITHIN THE PRISON SYSTEM ARE NOTORIOUS FOR CREATING VIOLENCE BY TARGETING NON-WHITE INMATES AND STAFF, ENGAGING IN COERCION, AND SMUGGLING DRUGS AND WEAPONS INTO THE CONFINES OF THE PRISON WALLS. IF THESE GROUPS ARE ALLOWED TO GROW IN PRISON, THEIR VIOLENT ACTS WILL EVENTUALLY SPILL OUT INTO THE COMMUNITY UPON THEIR RELEASE. (AFFIDAVIT OF MARC W. CLEMENTS, 3·24·11, p. 20, ¶ 90, AFFIDAVIT OF DANIEL A. WESTFIELD, 3·24·11, pp. 20-21, ¶ 87)

171. DISPUTE. IF THIS STATEMENT IS REFERRING TO ODINISM/ASATRU AS A GROUP THAT DEFENDANTS AND AFFIANTS ARE ~~ARE~~ FALSELY IDENTIFYING AS WHITE SUPREMACIST THEN PLAINTIFF DISPUTES ON THE BASIS THAT THERE IS NO EVIDENCE TO SUPPORT THIS CLAIM. IF THIS IS JUST A STATEMENT ABOUT UNSANCTIONED GROUPS IN PRISONS THEN PLAINTIFF HAS NO DISPUTE. (AFFIDAVIT OF DEREK S. KRAMER, 5·2·11, p 4 (PAGE 7-8 OF DOCUMENT), ¶ B., C.; DEFENDANTS PFOF ¶ 171)

172. The DOC provides a legitimate Religious Umbrella Group (Pagan) for those inmates who are sincere in the practice of religious beliefs related to Paganism, which includes adherents of Odinism, Asatru and other factions of the Pagan Religion. (Affidavit of Marc W. Clements, 3.24.11, p.21, ¶91; Affidavit of Daniel A. Westfield, 324.11, p.21, ¶88)

172. Dispute. Plaintiff disputes that GBCI provides a "Legitimate Religious Umbrella Group (Pagan) for those inmates who are sincere in the practice of... Odinism, Asatru." (Affidavit of Derek S. Kramer, 5.2.11, p.4, ¶18, p.6, ¶20-21, p.7, ¶24)

173. The DOC simply does not have the resources, space and staff to separately accommodate every faction of religious groups. (Affidavit of Marc W. Clements, 3.24.11, p.21, ¶91; Affidavit of Daniel A. Westfield, 3.24.11, p.21, ¶88)

173. Dispute. Plaintiff disputes that GBCI "does not have the resources, space and staff to separately accommodate" an Odinist/Asatru Religious group. Furthermore, Plaintiff disputes that Wicca is a "faction" of Odinism. Mr. Clements, Mr. Westfield and Defendants provide no evidence that GBCI cannot provide Odinist with a Religious service. (Affidavit of Derek S. Kramer, 5.2.11, p.7, ¶24, Exhibit 36 (Interrogatory of William Pollard), pp.5-6, ¶ 12-13, Exhibit 20; PFOF ¶ ~~173~~)

174. In his complaint, Derek Kramer # 314479 requested 15 religious property items which are listed as follows:

(1) Runes with storage bag and instruction book

(2) A Hlath

(3) Study Books

(4) An Altar for use in Religious Ceremonies

(5) An Altar Cloth

(6) A Blessing Bowl

(7) A ritual drinking horn, also referred as a Mead horn

(8) Candles

(9) A rune staff, also known as a Gandr

(10) Mead

(11) A ritual Thor's Hammer, also referred to as a Mjollner

(12) Images of gods for use in sacred rituals

(13) An Oath Ring

(14) An evergreen twig; and

(15) A Sun Wheel.

(Complaint, Docket # 15, pp.9-11, ¶¶ 72, 74; Affidavit of Daniel A. Westfield, 3.24.11, p.21, ¶89)

174. No Dispute

-42-

175. Derek Kramer #314479 has requested to possess and wear his Thor's Hammer emblem while in segregation. Inmates in segregation are permitted a paper or cloth substitute emblem only. (Affidavit of Daniel A. Westfield, 3.24.11, p. 22, ¶90)

175. No Dispute.

176. Several of the Religious property items identified above that Plaintiff Kramer has requested pose specific security threats, as follows:

176. Dispute. Plaintiff disputes that items he requested "pose specific security threats" in the context that them are nearly identical or far less dangerous than equivilant items ALLOW to other Religious groups. (Affidavit of Derek S. Kramer, 5.2.11, p. 9, ¶36)

177. Thor's Hammer emblem is permitted for congregate and personal use; However, it must comply with DOC's lanyard specifications which are designed for institution safety and security. Additionally a $75.00 limit is placed on a property. The allowance of gold or other expensive metals can be used by inmates to barter. Staff do not have the ability to ascertain the value of items. (Affidavit of Daniel A. Westfield, 3.24.11, pp. 22-25, ¶91)

177. Dispute. See Plaintiffs response in ¶143.

178. Inmates in segregation are permitted paper or cloth substitute Thor's Hammer emblem only, because of the need to restrict freedom and privileges of inmates in segregation in order to provide a safe and secure environment for staff and inmates, as explained above. (Affidavit of Daniel A. Westfield, 3.24.11, pp. 22-25, ¶91)

178. Dispute. Plaintiff wears his Thor's Hammer amulet AROUND THE NECK and uses it to protect him, as well as to hallow personal ritual space. Plaintiff disputes that there is such a thing as a "substitute Thor's Hammer" except in the minds of the Non-Odinist defendants and Mr. Westfield. (Affidavit of Derek S. Kramer, 5.2.11, p. 12, ¶52, pp 12-13, ¶54, p. 13, ¶¶ 55-56, Exhibit 9, ¶6; Affidavit of Laurel Owens, 7.19.10, ¶¶ 2-3)

179. Rune sets are comprised of a series of symbols that form a non-traditional alphabet used by practitioners of Odinism and other Related Religions to communicate and express ideas and concepts. (Affidavit of Daniel A. Westfield, 3.24.11, pp. 22-25, ¶91)

179. Dispute. Plaintiff disputes that Runes are "a non-traditional alphabet." Runes,

"ACCORDING TO TRADITION" WERE GIVEN TO MAN THROUGH ALFATHER ODIN. "LIKE THE BIBLE OR KORAN, THEY ARE A FOCUS FOR MEDITATION AND SPIRITUAL GUIDANCE" AND ODIN COMMANDS ODINIST TO "KNOW AND TO USE THE SACRED RUNES". (AFFIDAVIT OF DEREK S. KRAMER, 5-2-11, p. 6, ¶ 21, EXHIBIT 6, p. 21, ¶ 1, EXHIBIT 9, ¶ 4; AFFIDAVIT OF LAUREL M. OWENS-SENTARI, 12-27-10, p. 4, ¶ 13)

180. THE USE OF SYMBOLS OR CODES IN A CORRECTIONAL ENVIRONMENT AS A FORM OF COMMUNICATION AND EXPRESSION IS PROHIBITED BECAUSE THE CONTENT CANNOT BE EASILY REVIEWABLE BY SECURITY STAFF IN ORDER TO DETERMINE IF A SECURITY CONCERN EXISTS, SUCH AS GANG COMMUNICATIONS, AN ESCAPE PLAN, INCITING A RIOT, GROUP RESISTANCE OR PLAN TO ENGAGE IN INJURIOUS BEHAVIOR TOWARD SELF, ANOTHER INMATE OR STAFF. (AFFIDAVIT OF DANIEL A. WESTFIELD, 3-24-11, pp. 22-25, ¶ 91)

180. DISPUTE. PLAINTIFF IS **NOT** REQUESTING TO WRITE/COMMUNICATE TO ANY OTHER PRISONER IN/WITH RUNES. RUNES - IF THIS "SYMBOLS OR CODES" COMMENT IS DIRECTED THEIR WAY - ARE EASILY REVIEW-ABLE AS: DOC STAFF HAS PROVIDED A PAGE OF RUNES SHOWING THEIR SHAPES AND MEANINGS; PLAINTIFF HAS PROVIDED DOC STAFF/GBCI STAFF WITH INTERNET INFORMATION TO EASILY FIND OUT MEANING OF RUNES (odinicrite.org); PLAINTIFF PROVIDED DOC/GBCI STAFF WITH AN INTRICATE DESCRIPTION OF RUNES. FURTHERMORE, ALL DOC DO NOT SPEAK AND READ SPANISH, ARABIC AND HEBREW YET PRISONERS ARE ALLOWED TO WRITE TO OTHER PRISONERS IN SPANISH, ARABIC AND HEBREW AND EVEN SEND ARABIC DOCUMENTS. (AFFIDAVIT OF DEREK S. KRAMER, 5-2-11, p. 1, ¶ 4, pp. 18-19, ¶ 34, EXHIBIT 19, EXHIBIT 13, EXHIBIT 6, pp. 21-26 [ PROVIDED WITH EXH. 8, (A),(B) ]; EXHIBIT 37, p. 2, ¶¶ 2-3; AFFIDAVIT OF DAVID CRUTCHFIELD, 5-2-11, p. 2, ¶¶ 5-7, p. 3, ¶¶ 9-10)

181. ANY TYPE OF SECRET CODE OR LANGUAGE USED BY INMATES IN A CORRECTIONAL INSTITUTION IS A SECURITY CONCERN DUE TO THE SECURITY STAFF'S INABILITY TO READILY REVIEW AND TRANSLATE THE MEANING OF NOTES AND CORRESPONDENCE WRITTEN BY AN INMATE USING SUCH CODES TO ENSURE THE SAFETY OF THE INSTITUTION, STAFF AND THE COMMUNITY. (AFFIDAVIT OF DANIEL A. WESTFIELD, 3-24-11, pp. 22-25, ¶ 91)

181. DISPUTE. RUNES AREN'T A SECRET. (SEE PLAINTIFF'S RESPONSE IN ¶ 180.)

182. ADDITIONALLY, RUNES MAY BE EASILY ALTERED WHEN WRITTEN OR USED, CHANGING THE MEANING DRASTICALLY. A MINOR ALTERATION MAY TAKE A HARMLESS COMMUNICATION AND TURN IT VIOLENT, i.e., ORDERING A STRICK AGAINST ANOTHER INMATE OR SECURITY STAFF. (AFFIDAVIT OF DANIEL A. WESTFIELD, 3-24-11, pp. 22-25, ¶ 91)

182. DISPUTE. PLAINTIFF **DOES NOT** REQUEST TO WRITE/COMMUNICATE WITH OTHER PRISONERS WITH RUNES. RUNES ARE BEING REQUESTED AS AN INDIVIDUAL ITEM NOT GROUP ITEM AND LIKE TAROT CARDS THEY CAN

BE "IN-CELL USE ONLY." FURTHERMORE, DOC OFFICIALS/GBCI OFFICIALS ALLOW THE OGHAM TO BE OPENLY DISPLAYED AT THE CHAPEL AND "IN-CELL" — WHICH MEANS IN PLAIN VIEW OF ROOMMATE OR THOSE PASSING BY AND PLAINTIFF CONTENDS THAT THE OGHAM IS MUCH HARDER TO DECIPHER AND EASIER TO ALTER. (AFFIDAVIT OF DEREK S. KRAMER, 5.2.11, P. 1, ¶ 4, P. 5, ¶ 19(A)1.), EXHIBIT 23, P.1, P.2, EXHIBIT 24 [AS CITED ON AFFIDAVIT OF DEREK S. KRAMER, 5.2.11, PP. 11-12, ¶ 48]; AFFIDAVIT OF MARK W. CLEMENTS, 3.24.11, EXHIBIT 101-ATTACHMENT- RELIGIOUS PROPERTY CHART, P. 10 OF 10)

183. DOC AND RPAC HAVE RECOGNIZED AND BEEN INFORMED THAT RUNES HAVE BEEN USED IN NAZI SYMBOLISM BY NAZI AND NEO-NAZI GROUPS THAT ASSOCIATE THEMSELVES WITH WHITE SUPREMACIST GROUPS. (AFFIDAVIT OF DANIEL A. WESTFIELD, 3.24.11, P. 22-25, ¶ 91)

183. DISPUTE. PLAINTIFF DISPUTES THAT "WHITE SUPREMACIST GROUPS" ARE ODINIST. FURTHERMORE, ARABIC IS WRITTEN AND SPOKEN BETWEEN PRISONERS AND AT SERVICES EVEN THOUGH THE UNITED STATES ARE AT WAR WITH ISLAMIC TERRORIST, YET THIS IS DOC ALLOWED. ALSO, DOC STAFF HAVE HANDED OUT A PAGE OF RUNES — WITH SHAPES AND MEANINGS — WHICH SHOWS THAT IF RUNES WERE A SECURITY RISK THESE RUNES WOULD HARDLY BE HANDED OUT. (SEE PLAINTIFF'S RESPONSE IN ¶ 171; AFFIDAVIT OF DEREK S. KRAMER, 5.2.11, PP. 8-9, ¶ 34; AFFIDAVIT OF DAVID CRUTCHFIELD, 5.2.11, P.2, ¶¶ 5-7, P.3, ¶¶ 9-10)

184. WHITE SUPREMACY GROUPS IN A CORRECTIONAL INSTITUTION ARE PROHIBITED UNDER WISCONSIN ADMINISTRATIVE CODE DOC 303.20. THIS IS BECAUSE THESE GROUPS HAVE CREATED RACIAL TENSIONS AND AN INTOLERABLE RISK OF VIOLENCE IN PRISON GIVEN ITS RACIAL MAKE-UP. (AFFIDAVIT OF DANIEL A. WESTFIELD, 3.24.11, PP. 22-25, ¶ 91)

184. DISPUTE. PLAINTIFF DISPUTES THE COMMENT "RISK OF VIOLENCE IN PRISON GIVEN ITS RACIAL MAKE-UP." GBCI (AND THE WIDOC) APPROVE AND SUPPORT A GROUP SOLELY BASED ON "RACIAL MAKE-UP" AND RACIAL CULTURE — ITS NAMED THE NATIVE AMERICAN UMBRELLA RELIGIOUS GROUP. RACE IS AT THE FOREFRONT AND ACTIVE GANG MEMBERS ATTEND THIS RACE BASED RELIGIOUS GROUP. GBCI ALREADY HAS A RULE IN PLACE — DOC 303.20 — TO STOP ANY UNSANCTIONED GROUPS AND ODINISM/ ASATRU, AS A GROUP IDENTIFIED BY RELIGION NOT RACE, ARE ALREADY SANCTIONED THROUGHOUT THE DOC — ALONG WITH THEIR NORTHERN TRADITIONS SECT. IF THE TERM "WHITE SUPREMACIST" WERE DIRECTLY RELATED TO ODINIST/ASATRU IT COULD NOT BE ALLOWED AT ALL WITHIN GBCI/DOC BECAUSE "WHITE SUPREMACY GROUPS ... ARE PROHIBITED." (AFFIDAVIT OF DEREK S. KRAMER, 5.2.11, EXHIBIT 16; AFFIDAVIT OF SHANE KASHNEY, 3.29.11, P.2, ¶¶ 7-8 ["OUR CULTURE"], P. 3, ¶ 11; PFOF, PP 37-38, ¶ 184) (AFFIDAVIT OF DEREK S KRAMER, 5.2.11, EXHIBIT 2, P.6, ¶ 24)

185. There are no lesser restrictive ways, besides an outright ban on runes and/or rune cards, to address the safety and security concerns created by these runes. If the use of runes were limited to congregate activities, this would allow groups of inmates to potentially use them to communicate in a way that would go unmonitored and undetected by security staff. (Affidavit of Daniel A. Westfield, 3-24-11, pp. 22-25, ¶ 91)

185. Dispute. Plaintiff disputes that there "are no lesser restrictive" means to allow runes. (See plaintiff's response in ¶ 182)

186. Limiting runes to cell-use only is also a security concern due to the inmate's ability to pass the symbols by hiding them in their clothing, hair, other property, and fishing from cell-to-cell. (Affidavit of Daniel A. Webster, 3-24-11, pp. 22-25, ¶ 91)

186. Dispute. This is an exaggerated response to the in-cell rune issue. DOC staff has already given plaintiff a page of runes — with shapes and meanings — which would be MUCH easier to hide or alter or pass cell-to-cell in comparison to a prisoner's own property (rune tile/card) which could EASILY BE TRACED back to a prisoner because there are ONLY 24 runes. At this time prisoners could take a itty bitty piece of paper, draw whatever on it, and easily pass this. Why use one's own traceable (thus an actual help to DOC/GBCI officials/staff) personal property when non-traceable means are readily available at this moment. Defendants do not pass a common sense test given that a book on runes are already allowed, staff pass out papers on runes and runes are allowed to be written in a Book of Shadows Wiccan Holy book. A total ban would bolster their case but by allowing runes within the DOC/GBCI — though limited — they have already acknowledged their importance. (Affidavit of Derek S. Kramer, 5-2-11, pp. 8-9, ¶ 34; Also see plaintiff's response above in ¶ 182) (Affidavit of Derek S. Kramer, 5-2-11, pp. 11-12, ¶ 143, Exhibit 25, Exhibit 33, p. 5, ¶ 25)

187. Fishing occurs in prison and is a means for inmates to pass items from cell to cell without detection. Inmates can make a long string from prison clothing or bed sheets and tie a note or property item to the end of the string. By tossing the string under the cell door, inmates are able to pass information and small property items to other inmates without security staff detection. Due to the small size of the runes, it would not be difficult for inmates to pass the runes from cell to another, thereby

secretly communicating with other inmates.

187. DISPUTE. Defendants offer no evidence supporting this proposed fact. Furthermore, what seems more reasonable... someone writes a coded message on a piece of paper and passes this easily or someone takes some of their 24 Rune tiles, passes on one word, waits for the return of their used tiles, passes on word two, and so on until the message is sent. Ridiculous. (See Plaintiff's Response in ¶ 186)

188. Study Books, like any book, may be ordered by an inmate and the books are then reviewed in accordance with Wis. Admin Code § DOC 309.05 ("Publications") which policy includes reviewing the book for security risks. Until a book is ordered by the inmate and receive at the prison, it cannot be reviewed. An inmate seeking religious study books would need to order the book(s), so that it can be reviewed, and the book would then either be allowed to the inmate or denied with a non-delivery notice to the inmate (Affidavit of Daniel A Westfield, 3-24-11, pp. 22-25, ¶ 91)

188. No Dispute

189. A Mjollner is similar to a Thor's Hammer, and a Thor's Hammer is a permitted religious property items. However, the Mjollner is a larger impliment which is not permitted because it could be used as a weapon. Pictures of religious property impliments such as Mjollnirs may be used symbolically. (Affidavit of Daniel A. Westfield, 3-24-11, pp. 22-25, ¶ 91)

189. DISPUTE. The Mjollner has been allowed at WSPF, used at WSPF by Plaintiff and others during rituals (Kramer had asked the Court to take a picture of said Mjollner in his Motion to Compell, dkt. 33), and Plaintiff provides a picture/exhibit of a prison Mjollner of almost identical size to the one at WSPF. Furthermore Plaintiff disputes that a Mjollner would not be permitted because it could be used as a weapon when Defendants provide larger and more weaponized religious items to similarly situated religious groups (i.e. Deer Antlers, Buffalo Skull, 24" Cross/Crucifix). (Affidavit of Derek S. Kramer, 5-2-11, Exhibit 15, p. 57 of 72, 72 of 72, Exhibit 48, Top photo; Affidavit of Christopher K. Bennett, 4-1-11, p. 1, ¶ 5, ¶ 8; Affidavit of Theodore J. Hawver, 2-4-11, p. 2, ¶ 17, p. 3, ¶ 15) (Affidavit of Derek S. Kramer, 5-2-11, p. 9, ¶ 36)

190. A Gange is the spear of Odin. This impliment could be used as a weapon, and therefore is

NOT PERMITTED. PICTURES OF RELIGIOUS PROPERTY IMPLEMENTS SUCH AS GANDRS MAY BE USED SYMBOLICALLY. (AFFIDAVIT OF DANIEL A. WESTFIELD, 3-24-11, PP. 22-25, ¶ 91)

190. DISPUTE. A GANDR IS ALLOWED JUST NOT AT GBCI. WSPF HAS A GANDR AND PLAINTIFF USED IT DURING RITUALS. BECAUSE OF PRISON SECURITY CONCERNS ODINIST USE A GANDR "STAFF" WITH NO POINTED EDGES AND OF MINIMAL SIZE. (PLAINTIFF CALLS THIS A "RUNE STAFF" IN HIS COMPLAINT, dkt. 15, p. 11(6)). OTHER SIMILARLY SITUATED GBCI RELIGIOUS GROUPS ARE ALLOWED SIMILAR SHAPE/SIZE ITEMS (AFFIDAVIT OF DEREK S. KRAMER, 5-2-11, p. 9, ¶ 36; AFFIDAVIT OF CHRISTOPHER K. BENNET, 4-1-11, p. 1, ¶ 5, ¶ 8; AFFIDAVIT OF THEODORE J. HAWVER, 2-4-11, p. 2, ¶ 7, p. 3, ¶ 15) (AFFIDAVIT OF DEREK S. KRAMER, 5-2-11, EXHIBIT 7, p. 1, EXH. 41)

191. CANDLES ARE NOT PERMITTED FOR IN-CELL USE BECAUSE THEY POSE A FIRE HAZARD. (AFFIDAVIT OF DANIEL A. WESTFIELD, 3-24-11, PP. 22-23, ¶ 91)

191. DISPUTE. PLAINTIFF IS NOT REQUESTING "IN-CELL USE". CANDLES FOR GROUP USE ARE PERMITTED. (AFFIDAVIT OF DEREK S. KRAMER, 5-2-11, p. 9, ¶ 35 F., EXHIBIT 101- ATTACHMENT - RELIGIOUS PROPERTY CHART, p. 2 OF 10) - GBCI COULD ALLOW ODINIST THE SAME OPPORTUNITY/USE.

192. SUN WHEEL IS A KNOWN GANG SYMBOL, AND THEREFORE ITS USE MUST BE CAREFULLY RESTRICTED. (AFFIDAVIT OF DANIEL A. WESTFIELD, 3-24-11, PP. 22-25, ¶ 91)

192. DISPUTE. A PENTICALE IS A WICCAN SYMBOL APPROVED BY THE DOC/GBCI AND IT IS ALSO A GANG SYMBOL (GRINDEMANN v. LITSCHER, 2003 U.S. DIST. LEXIS 24616) - SAME FOR THE STAR OF DAVID - THE GBCI COULD RESTRICT THE SUN WHEEL TO BE PLACED ON THE ALTAR. (AFFIDAVIT OF DEREK S. KRAMER, 5-2-11, EXHIBIT 15, p. 66 OF 72, EXHIBIT 15, p. 67 OF 72, EXHIBIT 17, p. 6 ("WICCA, Page 12"). 7. PENTACLE: ; EXHIBIT 48, BOTTOM LEFT PICTURE/PHOTO)

193. SEVERAL OF THE RELIGIOUS PROPERTY THAT PLAINTIFF KRAMER HAS REQUESTED ARE ALREADY PERMITTED FOR INMATE USE WITHIN A CELL, EITHER WITH OR WITHOUT MODIFICATIONS, AS FOLLOWS. (AFFIDAVIT OF DANIEL A. WESTFIELD, 3-24-11, p. 25, ¶ 92)

193. NO DISPUTE.

194. THOR'S HAMMER EMBLEM. THIS ITEM IS PERMITTED FOR INDIVIDUAL USE, SUBJECT TO THE RESTRICTIONS SET FORTH IN DAI POLICY 309. 61. 02. INMATES IN SEGREGATION MAY POSSESS A PAPER OR CLOTH SUBSTITUTE EMBLEM (AFFIDAVIT OF DANIEL A. WESTFIELD, 3-24-11, p. 25, ¶ 92)

194. DISPUTE. SEE PLAINTIFF'S RESPONSE IN ¶ 178.

195. As for a Sacrificial Bowl, inmates are permitted to possess in their cell a plastic Tumbler, which they may purchase from the Canteen, an can be substituted for use as the Blessing Bowl. (Affidavit of Daniel A. Westfield, 3.24.11, p.25, ¶92)

195. Dispute. Blots are to performed as a group. The Bowl[2] is an item to be used at said Blot.. not in-cell. Petitioner requests this as a group item not for individual practice. (Affidavit of Derek S. Kramer, 5.2.11, p.9, ¶35, Affidavit of Laurel M. Owens-Scutari 12.27.11, p. 2, ¶6, p.3, ¶11) Blots are not practiced at GBCI. (Affidavit of Derek S. Kramer, 5.2.11, p.11, ¶41)

196. As for Mead, inmates are permitted to possess in their cell a plastic tumbler, which they may purchase from the canteen, and can be substituted for use as the Mead horn. (Affidavit of Daniel A. Westfield, 3.24.11, p.25, ¶92)

196. Dispute. Plaintiff states that this is requested for Blot Practice which is not allowed at GBCI. Other similarly situated groups are allowed this item for group use. (Affidavit of Daniel A. Westfield, 3.24.11, p.11, ¶43; Exhibit 101, attachment, Religious Property Chart, p.3 of 10 ("wine")

197. As for a Mead Horn, inmates are permitted in their cell a plastic tumbler, which they may purchase from canteen, and can be substituted for use as the Mead horn. (Affidavit of Daniel A. Westfield, 3.24.11, p. 25, ¶92)

197. Dispute. Plaintiff disputes that this items as an individual item. Plaintiff's requested said horn for Blot Practice, which is not allowed at GBCI. Other similarly situated groups are allowed very similar items for group use. (Affidavit of Derek S. Kramer, 5.2.11, p.9, ¶36, p.11, ¶43)

198. As for an Altar, inmates who have a foot locker already existing in their cell may use the foot locker as an altar. (Affidavit of Daniel A. Westfield, 3.23.11, p.25, ¶92)

198. Dispute. Plaintiff disputes that this item as an individual item. Plaintiff's requested the use of an altar for Blot Practice, which is not allowed at GBCI. Other similarly situated groups are allowed allowed an altar for their group ritual use (Affidavit of Derek S. Kramer, 5.2.11, p.11, ¶43; Exhibit 101, attachment, Religious Property Chart, p. 2 of 10)

199. As for an Altar Cloth, inmates may use a towel, washcloth or other cloth as a

* 2. Similarly situated groups are allowed metal similar items (Affidavit of Derek S. Kramer, 5.2.11, Exhibit 15, p. 30 of 72, p. 71 of 72)

substitute for an altar cloth. Inmates in general population may purchase a towel or cloth from the canteen, or a state-issued towel may be used. (Affidavit of Daniel A. Westfield, 3-24-11, p.25, ¶...

199. DISPUTE. Plaintiff disputes that this item is for individual use. Plaintiff quested an altar cloth for Blot practice, which is not allowed at GBCI. Other similarly situated groups get to use an altar cloth for their uses. (Affidavit of Derek S. Kramer, 5-2-11, p. 11, ¶43; Exhibit 101, Attachment, Religious Property Chart, p. 2 of 10)

200. It is RPAC's position that, when determining which Religious Property items to allow, a distinction needs to be made between religious property "needs" and "wants". (Affidavit of Daniel A. Westfield, 3-24-11, p.25, ¶93)

200. No DISPUTE.

201. It is not possible to allow all religious property requests because quantity and variety would be unmanageable. (Affidavit of Daniel A. Westfield, 3-24-11, p. 25, ¶93)

201. No Dispute.

202. RPAC consults with spiritual advisors to assess whether requested religious property items are necessity in the practice of that faith tradition, or whether the items are desirable but a practitioner may effectively honor the tenets of their faith without that particular item. (Affidavit of Daniel A. Westfield, 3-24-11, p.25, ¶93)

202. DISPUTE. Plaintiff disputes whether ANY Odinist/Asatru spiritual advisor was consulted when determining what "items" are necessity in the practice of "Odinism. The RPAC "Pagan" spiritual advisor is a Wiccan, Selena Fox (High Priestess of Circle Sanctuary), who wrote the WI DOC Religious Overview Manual who "coincidentally" is quoted in the Fed. BOP Wiccan part of the Handbook for Chaplains and it was Wiccan items that were kept when the WI DOC switched their Wiccan Group items into "Pagan" umbrella group items. A Thor's Hammer emblem was finally added in 2007 but before and since No Other Odinist Necessary items have been approved and specifically No Necessary items have been approved at GBCI. (Affidavit of Derek S. Kramer, 5-2-11, p.14, ¶63, Exhibit 17, p.6 ("Wicca, Page 12"), Section "6. Five Elements of Nature:", Exhibit 22, p.3, ¶9, Exhibit 18, p.2; Exhibit 101, Attachment, Religious Property Chart, pp. 9-10 of 10; ~~[crossed out]~~ Affidavit of Marc W. Clements, 3-24-11, p.19, ¶83)

203. Allowing excessive amounts of personal religious property constitutes a security threat because it provides more opportunities for inmates to hide contraband, and makes cell searches much more difficult as sacred objects must be handled with reverence. (Affidavit of Daniel A. Westfield, 3.24.11, p. 26, ¶94)

203. DISPUTE. Security staff are trained government officials very capable to do their jobs. Furthermore, see Petitioners Response in ¶94.

204. Further, overall facility management (inmate movement, potential property damage, transfer of property between inmates, theft, etc.) becomes much more difficult with large volumes of personal religious property. (Affidavit of Daniel A. Westfield, 3.24.11, p. 26, ¶94)

204. DISPUTE. See Plaintiff's Response in ¶95.

205. Many of the religious property items that Plaintiff Kramer has requested have been determined not to be religious property "needs," and therefore must be denied because of the security threats of allowing excessive amounts of personal religious property as well as the facility management needs of avoiding large volumes of personal religious property. (Affidavit of Daniel A. Westfield, 3.24.11, p. 26, ¶95)

205. DISPUTE. Plaintiff's Requested items are necessary and No prisoner is allowed "excessive amounts of personal religious property" per DAI Policy # 309.20.03 which solved the "excessive" property - ALL Property - issue. Plaintiff has requested those same personal religious items cited in the Fed. BOP Odinism/Asatru Handbook for chaplains which Laurel M. Owen-Sciarra states/swears "presents an accurate portrait of the beliefs... of most Odinist." Also of note is that the Defense's EXPERT WITNESS is a Religious advisor to the Fed. BOP and has NO statement Against those items the Plaintiff requested in his Affidavit. If Plaintiff just wanted Religious property in any kind of ~~unlimited~~ Amount He would have switched his Religious Preference to Islam. Here's a comparison:

| Plaintiffs Proposed Odinist Personal Property List | | Islamic Personal Property List | | |
|---|---|---|---|---|
| • Runes with Rune Bag | • Galdr Book | • Pendant/Ring | • Oil | (Islam is also allowed 25 total publications) |
| • Hlath | (Such instruction Books are added to publications Allowed. ie. 25 Books Total.) | • Kufi-Cap | • Miswak | |
| • Thor's Hammer Amulet | | • Kurda | • Prayer Beads | |

As can be seen the DOC actually lessens the amount of religious property a prisoner can personally possess ("Pagans" are allowed the following Wiccan items: 1.) Emblem, 2.) Oil, 3.) Book of Shadows, 4.) Feather, 5) Reflective surface, 6.) Tarot Cards). (Affidavit of Derek S. Kramer, Exhibit 6, pp4-5, Exhibit 26 -section B.5.; Affidavit of Laurel M. Owen-Schutari, 12-27-11, p. 2, ¶16; Affidavit of Mike Murray, 3-23-11, pp. 1-3, ¶¶2-9; Exhibit 101, Attachment, Religious Property Chart)

206. Asatru, also known as Odinism, is the native religion and spiritual belief system of the Northern European people before their conversion to Christianity. (Affidavit of Mike Murray, 3-23-11, pp. 2-3, ¶6)

206. No dispute.

207. Historically records prove that as a developed belief system, Asatru is over 7,000 years old. (Affidavit of Mike Murray, 3-23-11, pp. 2-3, ¶6)

207. No dispute.

208. After a period of dormancy, practice of the old religion was revived in the early 1900's in Continental Europe and Scandinavia. The term Asatru is Icelandic and describes the practices of the Scandinavian belief system while the term Odinist reflects a more Continental European view in their belief systems. (Affidavit of Mike Murray, 3-23-11, pp. 2-3, ¶6)

208. No dispute.

209. The primary core beliefs are the same and they both share a common belief in the Aesir and Vanir Gods and Goddesses of the Northern European people. (Affidavit of Mike Murray, 3-23-11, pp. 2-3, ¶6)

209. No dispute.

210. Since the religion of Asatru is classified as an earth religion, the needs and practices are somewhat similar to the Native Americans, Wiccans, and Theodish and other similar earth based faiths. (Affidavit of Mike Murray, 3-23-11, p. 3, ¶7)

210. No dispute.

211. The Asatru Alliance is a confederation of independent kindreds. There are presently two Asatru Alliance kindreds in Wisconsin. It is estimated that there are, in total, 5 or 6

Odinism/Asatru Kindreds in Wisconsin. (Affidavit of Mike Murray, 3·23·11, p. 3, ¶18)

212. It is well known nationally within the Odinism/Asatru community that Mr. Murray is the Director of World Tree Ministries, the prison outreach arm of the Asatru Alliance, and that he is responsible for assisting Odinist/Asatru volunteers nationwide who are willing to lead religious services and study groups in prison. (Affidavit of Mike Murray, 3·23·11, p. 3, ¶9)

212. No Dispute.

213. Mr. Murray's role in this regard is emphasized each year at the National Congress of the Asatru Alliance. If there were a sincere Odinist/Asatru adherent in Wisconsin who was knowledgeable and willing to volunteer to lead religious services and/or study groups in a Wisconsin prison, it is likely that the person would contact Mr. Murray. (Affidavit of Mike Murray, 3·23·11, p. 3, ¶9)

213. Dispute. While it is possible that someone might contact Mr. Murray about being a volunteer it is not a foregone fact, therefore the statement "it is likely" is conjecture. He is not the head of every Kindred or Hearth in Wisconsin or Illinois, Michigan or Minnesota either for that matter and therefore it is likely that there are Odinist willing to volunteer once word gets around (via internet, etc.) that actual Odinist practice is allowed in Wisconsin with the necessary religious group items. (PFOF, ¶213; Affidavit of Mike Murray, 3·23·11, p. 3, ¶9)

214. Mr. Murray has not heard from any prospective volunteers in Wisconsin, and therefore can state with a reasonable amount of certainty that there are no known Odinist/Asatru adherents in Wisconsin who are willing to lead religious services and/or study groups in a Wisconsin prison. To the best of Mr. Murray's knowledge, the nearest volunteers reside in Indiana and Missouri. (Affidavit of Mike Murray, 3·23·11, p. 3, ¶9)

214. Dispute. Being the Director of World Tree prison outreach for Asatru Alliance means he will hear from Asatru Alliance members/associates and therefore he cannot speak on behalf of other Midwest located Alliances/Kindreds/Hearths who do not associate with the Asatru Alliance. "The best of Mr. Murray's knowledge" is limited to who contacts him. (PFOF, ¶214, Affidavit of Mike Murray, 3·23·11, p. 3, ¶9)

215. James Ridges has been an approved volunteer at GBCI since the fall of 2006. (Affidavit of James

-53-

Riggs, 4.5.11, p.1, ¶12)

215. NO DISPUTE.

216. IN HIS CAPACITY AS AN APPROVED VOLUNTEER, MR. RIGGS LEADS THE PAGAN UMBRELLA GROUP SERVICES, AND HE GOES TO GBCI AT LEAST THREE TIMES A MONTH TO LEAD RELIGIOUS SERVICES FOR INMATES WHO HAVE CHOSEN PAGAN AS THEIR RELIGIOUS PREFERENCE. THE SERVICE USUALLY LASTS APPROXIMATELY ONE HOUR, FROM 8:15 AM TO 9:15 PM. (AFFIDAVIT OF JAMES RIGGS, 4.5.11, p.1, ¶3)

216. NO DISPUTE.

217. BEING AN UMBRELLA RELIGIOUS GROUP, MR. RIGGS IS AWARE THAT THE PAGAN UMBRELLA RELIGION GROUP AT GBCI IS MADE UP OF INMATES WHO PRACTICE A NUMBER OF SPIRITUAL TRADITIONS, INCLUDING CELTIC, WICCA, SHAMANISM, STREGHERIA, EGYPTIAN, TUETONIC, NORTHERN PATH, NORSE/ASATRU/ODINIST AND AFRO-CUBAN. (AFFIDAVIT OF JAMES RIGGS, 4.5.11, p.2, ¶4)

217. NO DISPUTE.

218. MR. RIGGS IS AWARE OF THE DIVERSE SPIRITUAL NEEDS AND RELIGIOUS PRACTICES OF INMATES WHO ARE FOLLOWERS OF DIFFERENT RELIGIOUS SECTS, AND THEREFORE, HE MAKES AN EFFORT TO INCORPORATE THE PRACTICES OF THESE SECTS AND LEAD THE RELIGIOUS SERVICES IN THE FORM OF WORSHIP SUITABLE FOR ONE OR MORE OF THE RELIGIOUS SECTS ON A ROUTINE BASIS TO ENSURE EQUITABLE AND INTEGRATED WORSHIP SERVICES FOR ALL PAGAN INMATES AT GBCI (AFFIDAVIT OF JAMES RIGGS, 4.5.11, p.2, ¶5)

218. DISPUTE. WHILE NORSE/ASATRU/ODINISM, TUETONIC AND NORTHERN PATH (TRADITIONS) ARE ALL SECTS OF EACH OTHER ALL THE OTHER NAMED RELIGIONS IN PFOF ¶217 ARE NOT SECTS OF ODINISM (e.g AFRO-CUBAN IS NOT A SECT OF ODINISM AND VICE VERSA, etc.). MOST OF WHAT MR. RIGGS CITES AS ATTENDING RELIGIOUS PREFERENCES ARE NOT EVEN ACKNOWLEDGED WI DOC APPROVED RELIGIOUS GROUPS UNDER THE PAGAN UMBRELLA AND HEREIN LIES PART OF MR. RIGGS PROBLEMS. PER POLICY - DAI POLICY # 309.61.01, SECTION II. 3. - "THE LARGEST NUMBERS OF INMATES WITHIN DESIGNATED RELIGIOUS PREFERENCES" "WILL PROVIDE RELIGIOUS SERVICES". WHICH MEANS THAT SERVICES, ACCORDING TO DOC/DAI POLICY, ARE NOT SUPPOSE TO "INCORPORATE... ONE OR MORE" OF THE

Religious preferences attending (even those not on the approved Pagan Umbrella Group List) as is done at GBCI. Furthermore, Odinism - and its named sects - are always the "largest numbers" unless Mr. Riggs decides to pull similar stunts like he did at GBCI on 3.18.08. (Affidavit of Derek S. Kramer, 5.2.11, pp2-3, ¶ 11, p.3, ¶ 12, pp. 4-5, ¶ 18, Exhibit 1, p.1, ¶ 3 pp. 2-3, ¶ 3, Exhibit 16; Exhibit 100, p. 6 (section "3."); Affidavit of James Dank, 10.29.09, p. 3, ¶¶ 12-13,

219. The structure of the Pagan Umbrella Religious Group includes both Lesson/Discussion sessions and religious rituals. (Affidavit of James Riggs, 4.5.11, pp. 2-3, ¶ 16)

219. DISPUTE. While I agree that is how it is suppose to be structured something different was attempted in March/April 2008. After the discouragement of Odinist its possible this structure was again instituted. (Affidavit of Derek S. Kramer, 5.2.11, pp 2-3, ¶ 11) (Affidavit of Levi Doherty, 8.11.10, p.1, ¶ 3)

220. While lessons are designed to include all groups, comparing similar beliefs and practices, the Asatru/Odinist continue to complain that not enough time is devoted to only the Asatru traditions. The truth of this complaint can be refuted by looking at the amount of time dedicated to this group. (Affidavit of James Riggs, 4.5.11, pp. 2-3, ¶ 16)

220. DISPUTE. While all groups attend (even those not recognized by the DOC) it is suppose to be the service of the "largest numbers" that lessons are to be designed around. And thus the "largest numbers" rituals as well. (Exhibit 100, p. 6 (section "3."))

221. Beginning in February of 2010 the group spent four sessions covering Asatru/Odinist philosophies, a breakdown of the deities, ideas, and practices of Asatru. (Affidavit of James Riggs, 4.5.11, pp. 2-3, ¶ 6)

221. DISPUTE. While Plaintiff was at GBCI in 2008 these sessions "covering Asatru/Odinist" theology were not held and neither were these covered in 2009. The fact that Mr. Riggs has to point to Feb. 2010 in covering the largest number of attendees theology speaks volumes. (Affidavit of James Dank, 10.29.09, p. 2, ¶ 10, p.3, ¶ 16; Affidavit of Richard Winters, 10.30.09, p.1, ¶¶ 4-7; Affidavit of James L. Thompson, 4.8.09, p.2, ¶ 10; Affidavit of Anthony Caravella, 3.2.09, p.1, ¶¶ 4-5, p.2, ¶ 6) (Affidavit of Derek S. Kramer, 5.2.11, Exh. 2, p.4, ¶ 14 (Defendant Donovan doesn't allow Poetic Edda at Chapel because no Odinist study - Exhibit 2, p.4, ¶ 14)

222. Near the end of summer 2010, the group spent another four weeks studying the

HAVAMAL, PART OF THE ASATRU SACRED TEXTS. IN THIS SAME YEAR, THE GROUP ALSO SPENT TWO WEEKS DISCUSSING THE NINE NOBLE VIRTUES OF ASATRU. (AFFIDAVIT OF JAMES RIGGS, 4.5.11, pp. 2-3, ¶16)

222. DISPUTE. PoeticEdda CONTAINS HAVAMAL. PoeticEdda NOT ALLOWED AT GBCI CHAPEL BECAUSE NO ASATRU STUDY. Exh.2, p.4, ¶14

223. IN EACH YEAR, THE GROUP MEETS 36 TIMES AND EIGHT OF THESE ARE DEVOTED TO RITUALS. AS FAR AS THE RITUAL PRACTICES OF THE GROUP, MR. RIGGS INCLUDES THE BELIEF SYSTEMS OF ALL THE TRADITIONS IN THE GROUP, AND HE HAS ALSO SOLICITED INPUT AND IDEAS FROM THE ASATRU MEMBERS OF THE PAGAN UMBRELLA GROUP AS TO THE RITUALS THAT THEY WOULD LIKE TO BE INCLUDED IN THE SERVICE. (AFFIDAVIT OF JAMES RIGGS, 4.5.11, pp. 2-3, ¶16)

223. NO DISPUTE.

224. UNDER THE SUPERVISION OF MR. RIGGS, ASATRU INMATES ARE ALSO ALLOWED TO CARRY OUT SPECIFIC ROLES DURING THE RITUALS BY PARTICIPATING IN ACTIVITIES SUCH AS HAMMER HALLOWING, READING OF SACRED TEXT AND CALLING OF ANCESTORS. (AFFIDAVIT OF JAMES RIGGS, 4.5.11, pp. 2-3, ¶16)

224. DISPUTE. SEE PLAINTIFFS' RESPONSE IN ¶¶ 221, 222 (AFFIDAVIT OF DEREK S. KRAMER, 5.2.11, EXH. 2, p.4, ¶14)

225. AS THE HISTORICAL CONTEXT OF ALL OF THE SEASONAL RITUALS ARE NORTHERN EUROPEAN THEY EXPLAINED USING ASATRU, CELTIC, TEUTONIC, GREEK, AND ROMAN STORIES THEN RELATED TO THE DEITY FUNCTIONS OF THE REMAINING GROUP MEMBERS. EACH RITUAL INCLUDES ASATRU/ODINIST TRADITIONS SUCH AS THE HAMMER HOLDING. (AFFIDAVIT OF JAMES RIGGS, 4.5.11, pp. 2-3, ¶16)

225. NO DISPUTE.

226. EACH YEAR OUR RITUAL FEAST INCLUDES A SUMBEL WHICH IS A PURELY ASATRU/NORSE RITUAL. (AFFIDAVIT OF JAMES RIGGS, 4.5.11, pp. 2-3, ¶16)

226. NO DISPUTE.

227. MR. RIGGS BELIEVES THAT THE ASATRU/ODINIST GROUP COMPLAINTS THAT THEIR SPIRITUAL TRADITIONS ARE IGNORED IS COMPLETELY UNFOUNDED, AS HE HAS MADE ATTEMPTS TO INCORPORATE ASATRU/ODINIST RELIGIOUS PRACTICES IN THE SERVICES THAT HE LEADS AT GBCI. (AFFIDAVIT OF JAMES RIGGS, 4.5.11, p. 3, ¶7)

227. DISPUTE. IN BREAKING UP AND ONLY ALLOWING ODINIST BITS AND PIECES OF A ODINIST RITUAL MIXED IN ("INCORPORATE") WITH MULTIPLE OTHER RELIGIOUS PATHS RITUALS DOES NOT MEET THE NEEDS OF AN ODINIST AND THIS SUBSTANTIALLY BURDENS ODINIST IN THEIR PRACTICE.

BY ONLY PRACTICING 8 (EIGHT) RITUALS (EQUAL TO THE 8 WICCAN SABBAT'S) WHILE ASATRU/ ODINIST PRACTICE A BLOT EVERY MONTH — AT LEAST — IS WHY ODINIST ARE SUBSTANTIALLY BURDENED AT GBCI. THIS DISCONNECT IS COMMON WHEN WICCANS AND ODINIST AND THEIR SECTS ARE FORCED TO PRACTICE WITH EACH OTHER. (AFFIDAVIT OF DEREK S. KRAMER, 5.2.11, P. 7, ¶ 24 ¶ 26-27, EXHIBIT 17, P. 1 ("WICCA, PAGE 2"), SECTION 1.C. "EIGHT SABBATS")

228. DEFENDANT RICK RAEMISCH DID NOT SIGN NOR EXPRESSLY APPROVE DAI POLICY DAI POLICY 309.61.01, RELIGIOUS BELIEFS AND PRACTICES, OR DAI POLICY 309.61.02, RELIGIOUS PROPERTY; THESE POLICIES WERE APPROVED BY STEVEN CASPERSON FORMER DAI ADMINSTRATOR AND WILLIAM J. GROSSHANS, DAI ADMINISTRATOR, (AFFIDAVIT OF DANIEL A. WESTFIELD, 3.24.11, PP. 3, 6, ¶¶ 8, 24, EXHIBITS 100, 101; AFFIDAVIT OF MARC W. CLEMENTS, 3.24.11, PP. 3, 6, ¶¶ 11, 27, EXHIBITS 100, 101)

228. DISPUTE. PLAINTIFF DISPUTES THE NOTIONS EXPRESSED IN THIS PARAGRAPH. RICK RAEMISCH IS A DEFENDANT IN THE PART OF THIS SUIT DEALING WITH A THOR'S HAMMER AMULET BEING ALLOWED IN SEGREGATION — NOT THE DOC-2075s OR ISSUES AT GBCI. DEFENDANT RAEMISCH WAS THE DOC SECRETARY THAT APPOINTS RPAC MEMBERS AND WHO WAS, FOR LACK OF A BETTER EXAMPLE, IN CHARGE OF RUNNING THE WIDOC WHEN THE THOR'S HAMMER WAS ADDED TO THE DOC 309 IMP 6A IN 2007 ("ADDED" TO BUT DISALLOWED THE AMULET IN SEGREGATION). (AFFIDAVIT OF DEREK S. KRAMER, 5.2.11, EXHIBIT 47, — DATED 12.4.2006 — P. 3, ¶ 2 ("7."); AFFIDAVIT OF MARC W. CLEMENTS, 3.24.11, P. 19, ¶ 83)

229. DEFENDANT RICK RAEMISCH DID NOT SIGN THE DENIAL OF PLAINTIFF KRAMER'S DOC-2075 REQUESTS FOR NEW RELIGIOUS PRACTICE/PROPERTY. (AFFIDAVIT OF MICHAEL DONWAN, 4.1.11, P. 3, ¶ 11, EXHIBIT 102, PP. 2, 6, 11)

229. NO DISPUTE.

SIGNED/DATED THIS 3RD DAY OF MAY, 2011 AT BOSCOBEL, WI.

DEREK S. KRAMER #314479
WSPF
P.O. BOX 9900
BOSCOBEL, WI 53805